[Crim. No. 22236. Second Dist., Div. Four. May 8, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL KENNETH PARKS, Defendant and Appellant.

**COUNSEL**

Velma E. Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KEENE, J.***—Michael Kenneth Parks was charged by information with murder in violation of section 187 of the Penal Code. A jury found him guilty as charged and further found the murder to have been of the first degree. The same jury in the bifurcated penalty phase returned a verdict of death. The trial judge denied a motion for a new trial, refused to modify the jury's verdict of death and ordered, by judgment, that it be put into effect. An appeal lies and is automatic. (Pen. Code, § 1239, subd. (b).)

On Saturday afternoon, March 15, 1969, in Redondo Beach, two young boys were tramping a vacant area adjacent to some railroad tracks "looking for bats and lizards and things like that." Their gruesome finding far exceeded the stated objectives and led to the solution of the murder of a young college student by the name of Patricia Pierson. They found her mutilated and decomposed torso in a trash heap under an old mattress. Her head, hands, and breasts had been severed and what was left of her body had been subjected to further cutting and stabbing, the ghastly details of which need not be detailed here. The evidence of the defendant's guilt is overwhelming; his contentions of error are void of merit; we affirm the judgment of conviction, modifying it first, as we must, to life imprisonment. (*People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].)

On January 27, 1969, Patricia Pierson was living in an apartment in Inglewood with her roommate, Linda Griffin. At about 9 o'clock that night the deceased left her apartment, driving her 1963 Oldsmobile, with a statement to her roommate that she had "to go get a pair of shoes." Linda Griffin never saw her roommate alive again.

---

*Assigned by the Chairman of the Judicial Council.

In January of 1969 defendant was employed at a Gulf gas station on South Hawthorne Boulevard where Patricia Pierson had left her car for some repairs. Some time during the month of January defendant redelivered her car to her apartment and was, in turn, driven back to the gas station by Patricia Pierson. On January 27 defendant's employment hours were 12 noon to 10 p.m. No robbery took place at the gas station that night, nor during the months of January or February, and the manager of the station did not at any time during this period see any blood in or about the station.

During the month of January 1969 defendant lived with his wife and her sister, among others, in a house in Lawndale. In that month at about 11 p.m. one night the defendant went home covered with wet blood, which was on his shirt, hands, and arms. He was wearing a uniform and the greatest concentration of blood appeared around the chest area. He then left, stating that he had to go back to the station "to pick something up." When he returned, about 12:30 a.m., the following morning, he was in a fresh uniform. His wife made him a sandwich, gave him a "Pepsi," and they watched a t.v. movie together. The defendant and his wife left their house thereafter and drove away in Miss Pierson's Oldsmobile.

The following day defendant's sister-in-law, Janice Parks, asked him for an explanation of the blood and the Oldsmobile. This was the defendant's explanation, as related by Janice Parks from the witness stand:

"'Q. And what did you ask him?

"A. Well, I told him what Janet had told me, and I said, well, I said, 'Could you tell me the rest, what happened?'

"He says, 'Oh, nothing much. You know.'

"And then he told me a little more about what Janet had said, and then I said, 'I notice the car.'

"And he said, 'Well, the guy down at the station gave it to me to come home in so I didn't have to use my own car.'

"Q. Well, what in specific did the defendant tell you about the night before?

"A. That he had prevented a robbery. That two guys said they wanted to buy some bulbs and wanted to hold the station up.

"Q. And did he tell you how he happened to get covered with blood during this incident?

"A. Yes. He said he stabbed one of the guys with a pair of large scissors that was in the drawer in the office.

"Q. And did he tell you whether or not they captured any of these robbers?

"A. Yes. He said they caught one, the one that had been stabbed.

"Q. And did he tell you what he did with that robber?

"A. Yes. They put him in the back seat of the Olds.

"Q. And where did they take this man? Did he tell you?

"A. No. Just said they put him in the back seat while a friend of his went to call the police.

"Q. And did he tell you that the friend had given him this Oldsmobile that night?

"A. He said he gave it to him to use that night, and the next day—I said, 'Well, you had it last night.'

"He said, 'Yeah. He gave it to me last night to borrow,' he said. 'But I'm going to buy it from the guy.'

"Q. And did he tell you how much he was supposed to pay for the car?

"A. He was supposed to be paying $5 a week on it. I think it was $129.

"Q. A total price of $129?

"A. Yes.

"Q. And did he tell you why the man sold him the car?

"A. Yes. He said he wanted—the guy wanted to buy a Porsche and his wife said he couldn't as long as he had that car. So he wanted to get rid of it and buy himself a brand-new Porsche.

"Q. Did he tell you anything about the other man that had sold him the car?

"A. No, he didn't."

At about the same time the defendant had in his possession Patricia Pierson's driver's license, social security card, and bank book. When his sister-in-law asked for an explanation of this, the defendant said: ". . . he said it was in the trunk of the car, and the guy that he was buying the car from said that anything he found in the car he could keep or use, and it was supposed to belong to the guy's wife, and he said, 'Write as many checks as you want. I'll pay all the charges on them.' "

His wife, Janet Parks, was wearing Patricia Pierson's ring with the explanation that this, too, was found in the trunk of the Oldsmobile. About

the first of February the defendant used the deceased's gas credit card, signing the name "P. Pierson" and when questioned about the expiration date told a gas station attendant that the card was in his father's name, "T. A. Pierson, Jr.," and that his father was sending him a new one from New York and would guarantee all purchases made on the expired one.

The defense consisted of the testimony of the defendant's wife, mother, mother-in-law, and that of a neurologist and a psychiatrist. With the exception of some significant testimony by his wife, on cross-examination, relative to the night of January 27, 1969, the testimony of the relatives was limited to his longstanding temperamental behavioral patterns. (On the bloody night in question his wife found him to have been "extremely nervous and upset" when he came home for the first time and reportedly had been involved in a robbery at the gas station.) The neurologist was of the opinion that the defendant quite possibly had a temporal lobe dysfunction but the laboratory tests were inconclusive of this diagnosis. The psychiatrist was of the opinion that the defendant was neither normal nor psychotic nor insane and described his problem as being "episodic" and that it "pertains to a compulsive syndrome with an explosion of affect." Two additional psychiatrists were called by the People in rebuttal; in the course of their respective examinations, the defendant refused to talk to the first but did to the second, Dr. Albert J. Boner. He told Dr. Boner that he had known the deceased but about a week and that on the night in question they drove in her car to Hermosa Beach where he took some "reds." He said that he remembered going home with Patricia Pierson in her car and then going to his home in her car without her. He admitted the bloody condition of his clothing and the made up story of the fight and robbery at the gas station to account for it. He did not remember killing or dismembering her body. He told the doctor that it was very possible that he did these things without knowing it in that he was under the influence of drugs that night. In Dr. Boner's opinion the defendant's professed loss of memory of some of the events that evening was totally inconsistent with what he did remember. ("Well, it was my clinical opinion that if he had taken enough of the drugs to impair his mental capacity, he would not have remembered practically everything, or most everything, that happened prior to the offense charged, and to remember so short a period of time after that.") In summary, the doctor concluded: "Well, it was my medical opinion that he was not suffering from amnesia at that time."

We have recounted only a portion of the evidence produced at the trial. We have not detailed, among other events, the subsequent extensive use of the Oldsmobile by the defendant, the totally conflicting and inconsistent stories told by the defendant relative to his possession of the car, and the

attempted cashing of a check in the name of the deceased. It is not necessary—the evidence of his guilt is clear, convincing, beyond a reasonable doubt, and, indeed overwhelming.

We turn now to the defendant's contentions of error upon which he predicates his request for a reversal; they are:

(1) The evidence is insufficient to sustain the judgment of conviction;

(2) The evidence of first degree felony murder is insufficient and the jury was therefore erroneously instructed on that issue;

(3) Prejudicial misconduct by the prosecutor;

(4) The *voir dire* of the jury on the death penalty created a "guilt oriented jury";

(5) The sentence of death may not be imposed; and,

(6) Prejudicial error was committed by the admission into evidence of five photographs depicting portions of the deceased's body.

## THE SUFFICIENCY OF THE EVIDENCE

It would serve no useful purpose to reiterate here our abbreviated recitation of the facts of the murder and the evidence of it produced at the trial. In reviewing the record on appeal in the context of a judgment of conviction it is our duty to do so in the light most favorable to the People and to presume the existence of every fact the trier of fact could reasonably deduce from the evidence. Judged by these standards this trial record is not wanting. It is not our function to attempt a reasonable reconciliation of the facts with a contrary finding—and, indeed, in this case we would fail in any such attempt. The appellate application of this standard does not vary when the People rely on circumstantial evidence, as they clearly have the right to rely on this type of evidence to connect the defendant with the crime charged and to establish that he committed it beyond a reasonable doubt. (*People* v. *Reilly,* 3 Cal.3d 421 [90 Cal.Rptr. 417, 475 P.2d 649]; *People* v. *Mosher,* 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Redmond,* 71 Cal.2d 745 [79 Cal.Rptr. 529, 457 P.2d 321].) It *is* our function to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt; this we easily do. (*People* v. *Reilly, supra; People* v. *Redmond, supra; People* v. *Bassett,* 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777].) Here the evidence disclosed a relationship, however slight, between the defendant and Patricia Pierson, her death, and the morbid dismemberment of her body. Her blood was

literally on his hands and the jury, by its verdict of murder, found it to be figuratively there as well. We will not disturb its finding.

## FIRST DEGREE FELONY MURDER

"Either party may present to the court any written charge on the law, but not with respect to matters of fact, and request that it be given. If the court thinks it correct and pertinent, it must be given; if not, it must be refused." (Pen. Code, § 1127.) ■ Among others, the People requested and received an instruction on first degree felony murder with robbery being the defined felony.[1] The case was tried on the theory of first degree murder and one of the plausible theories of the higher degree of murder was that the deceased's Oldsmobile was one of, if not the, objectives of the defendant. We need supplement our factual recitation only briefly to pinpoint the plausibility. The defendant's father-in-law gave a vehicle to his two daughters for their alternating use along with their respective husbands. About three or four days before the killing of Patricia Pierson, a family argument developed over the use of the vehicle during which the defendant became angry, relinquished his right of use by telling his sister-in-law that she could keep the car and "that he was going to go out and get himself one a lot better than that." Within a week he accomplished his announced intent and "moved up" from the part-time use of a 1960 Dodge to a 1963 Oldsmobile.

Within the contention relative to the instruction of first degree felony murder the defendant raises the additional point that the evidence of diminished capacity, produced at the trial negates, in and of itself, first degree murder. In no way can it be said that the evidence on the issue of diminished capacity was clear, and the very best that can be said is that it was in conflict. The issues in a criminal case are determined by the evidence. In this case there was some evidence of diminished capacity and that issue was not only properly submitted to the jury, but was within its exclusive province. We need not detail nor weigh that evidence, for the conflict, however small or large, was resolved by the jury; and that reso-

---

[1] CALJIC No. 8.21: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree.

"The specific intent to commit robbery . . . and the commission or attempt to commit such crime must be proved beyond a reasonable doubt."

CALJIC No. 9.10: "Robbery is the taking of personal property of any value in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear and with the specific intent permanently to deprive the owner of his property."

lution was adverse to the defendant. Further, the jury arrived at its determination on this issue guided by full and complete instructions given to it by the trial judge.[2] The defendant had a right to a jury trial on all of the issues presented by the evidence; this right was not denied. (*People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281]; *People* v. *Modesto,* 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].)

## PROSECUTORIAL MISCONDUCT

The defendant did not testify on his own behalf, choosing instead to rely on the state of the evidence. He asked for and received CALJIC No. 2.61 ("DEFENDANT MAY RELY ON STATE OF EVIDENCE"),[3] among the instructions, given to the jury. The jury, incidentally, was given all instructions, save the last, prior to argument. ■ The contention of prosecutorial misconduct is anchored in *Griffin* and predicated on part of the deputy district attorney's argument. (*Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) Before relating the complained-of "hypothetical" in the prosecutor's argument, it is noteworthy that no objection was made to it at the time nor was a timely request for an admonition to the jury

---

[2]CALJIC No. 8.77: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished· capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.

"Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree.

"Also, if you find that his mental capacity was diminished to the extent that you have a reasonable doubt whether he did harbor malice aforethought, you cannot find him guilty of murder of either the first or second degree.

"Furthermore, if you find that his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter.

"Further, if you find that his mental capacity was diminished to the extent you have a reasonable doubt whether the Defendant was capable of forming the specific intent to rob·or deprive the victim of permanent possession of her property, you must give the Defendant the benefit of that doubt and you could not then find him guilty of murder in the first degree on the theory that the killing of the victim occurred as a result of the commission of or attempt to commit robbery."

[3]"In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support by itself a finding against him on any such essential element."

made. (The argument was on a Friday and the following Monday an "assignment of error" was attempted and rejected by the trial court as was a motion for a mistrial made on Tuesday.) In arguing circumstantial evidence the prosecutor said the following:

"Now, what is the significance of all the evidence that I've told you about? Well, the court has told you that the People need not prove a case by direct evidence, and there's no difference between direct evidence and circumstantial evidence as a means of proof, and neither is entitled to any greater weight than the other.

"That's a very standard instruction. It means that sometimes circumstantial evidence might be more important, sometimes direct evidence might be more important; and you all promised me when I examined you at the first part of the trial that you will consider circumstantial evidence, you have no prejudice against it, and that you could convict the defendant of murder in the first degree, even if you had to rely on circumstantial evidence.

"Now, think about this for a moment: Can it be any other way? Because aren't most murders done in secret? I mean, who would pick an audience to kill someone?

"If we were to rely solely on other witnesses, we'd never catch all the people who commit crimes of this nature. You've got to rely on statements the defendant makes to other people. You've got to rely on physical evidence. Otherwise, the secret kind of crimes would go undetected.

"Now, let me just give you a quick hypothetical about a circumstantial case and see if you can analogize it with this one.

"Pretend you have got a daughter about four years old who is interested in perfume, and one day you're out for a couple of hours, and she's there with, perhaps, the baby-sitter, and when you come back, she's got a certain perfume odor about her person.

"You say, 'That's my Arpege, and I know it. Judy, where did you get the Arpege, or where did you get the perfume on you?'

"And she says, 'I don't know. I'm not talking. I'll stand on the Fifth Amendment.'

"So, assume she doesn't testify. We have to draw some other inferences.

"So she goes to her bottle of Arpege, and the top is off. There's even some spilled on the counter.

"Now, she still refuses to talk to the mother. We have to draw a few inferences.

"Number one, there is no direct evidence in that kind of a case. No one saw her putting this woman's Arpege on her body, or wherever she put it, but the fact that the top is off, the fact that the girl was there all day, the fact that she's got what appears to be that same odor—fragrance, I should call it. I'm sorry—on her person later in the day, would indicate that the girl did, in fact, take that perfume from the mother's perfume bottle.

"That's a purely circumstantial case; but can you think of a stronger circumstantial case? I probably would even vote to convict her.

"But that's the kind of case we have: The case where the circumstantial point to only one conclusion, that is, the defendant killed Patricia Pierson.

"The jury is allowed to make any reasonable inference from the facts adduced in this case, that is, you can just look at the facts, and you can draw an inference from those facts if it's reasonable.

"So that when a defendant tells people that he got the car from these various sources, you can draw the only reasonable inference that I think that you are able to draw, and that is because they are false and misleading. He must want to hide the fact as to where he really got the car. That is, he doesn't want people to know that he got the car from Patricia Pierson.

"Why else would anyone want to lie about where he got a car? Why would he lie about the robbery story? Because, obviously, he doesn't want people to know where he really got the blood on his person.

"There's no evidence as to where he got the blood on his person. No one saw him getting gushed full of blood as he lay—as he stood over the helpless body of Patricia Pierson and stabbed her 57 times.

"But do you really have to have a motion picture of the killing?"

Drawing upon the stock "circumstantial evidence argument 1-A" the deputy district attorney explained the concept to the jury, as we have all heard it many times, by use of the cookie-jar-perfume-bottle-mother-child example. While we don't applaud the prosecutor's originality, we don't by the same token condemn the argument as violative of *Griffin*, which, as we know, prohibits both prosecutorial comment on the defendant's silence and judicial comment that such silence is evidence of guilt. We simply do not have either situation in the case before us. "In sum, it seems quite clear that the rule enunciated in *Griffin* was not intended to require that the trier of the fact, whether judge or jury, be immunized against any dictate of plain reason. 'There is no war between the Constitution and common

sense.' (*Mapp* v. *Ohio,* 367 U.S. 643, 657. . . ." (*People* v. *Beghtel,* 239 Cal.App.2d 692, 695-696 [49 Cal.Rptr. 235].)

Additionally, we have assumed arguendo that the prosecutor's argument was in fact violative of the constitutional doctrine enunciated in *Griffin;* we then measured it against *Chapman,* i.e., can it be treated as harmless error, if error it was? (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) It measured up; the evidence of the defendant's guilt is so convincing, indeed so overwhelming, that the prosecution more than carries its burden of proving "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 710].)

## DEATH PENALTY VOIR DIRE

The next contention of the defendant is that a "guilt-oriented" jury resulted from the *voir dire* of the jury on the question of the death penalty. This case was tried pre-*Anderson* in that period between *Witherspoon* and *Anderson,* which we now know was one of retroactive but not complete futility in the criminal jury selection process. (*Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]; *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].)

In support of this contention the defendant offers nothing but argument, surprisingly enough, predicated upon *Witherspoon.* Not only is the defendant's reliance on *Witherspoon* inapposite, but mere argument in this vein is insufficient; and our Supreme Court has repeatedly, and very recently, said so in rejecting this contention as void of merit. "We must again reject the contention not only because of our decision in *People* v. *Anderson, supra,* 6 Cal.3d 628 but because we are not willing to accept as decisive the conclusion of the Jurow[4] study that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. Defendant simply fails to establish the validity of such a claim." (*People* v. *Murphy,* 8 Cal.3d 349, 368 [105 Cal.Rptr. 138, 503 P.2d 594].) The same failure is even more manifest here. (*People* v. *Rhinehart,* 9 Cal.3d 139 [107 Cal.Rptr. 34, 507 P.2d 642]; *People* v. *Brawley,* 1 Cal.3d 277 [82 Cal.Rptr. 161, 461 P.2d 361]; *People* v. *Nabayan,* 276 Cal.App.2d 361 [80 Cal.Rptr. 779].)

---

[4]Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process* (1971) 84 Harv.L.Rev. 567.

## The Photographs

█ Numerous photographs depicting portions of the body of the deceased were marked for identification and offered into evidence. The court rejected thirteen and admitted the five in question. The photographs were clearly relevant on the issue of the manner in which Patricia Pierson met her death and they were utilized by the medical expert in explaining his findings to the jury. Section 352 of the Evidence Code provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Hideous as the photographs may be (and they could hardly be less considering the nature of the crime perpetrated by the defendant), the decision to admit them into evidence is that of the trial judge. He concluded that their probative value exceeded their possible prejudicial effect; we concur. His ruling will not be second guessed on appeal in the absence of a showing of an abuse of discretion which is manifestly not the situation here. (*People* v. *Murphy,* 8 Cal.3d 349 [105 Cal.Rptr. 138, 503 P.2d 594]; *People* v. *Bradford,* 70 Cal.2d 333 [74 Cal.Rptr. 726, 450 P.2d 46].)

## Judgment

The judgment provides for the penalty of death and, as such, it must be and now is modified to provide for a punishment of life imprisonment; as so modified it is affirmed in all other respects. (*People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].)

Jefferson, Acting P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 6, 1973.