[Crim. No. 2586. Fifth Dist. May 10, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
ELMER VON JENTRY, Defendant and Appellant.

618

COUNSEL

Allen Ruby, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall and Peter J. McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

BROWN (G. A.), P. J.—Appellant, Elmer Von Jentry, was convicted by a jury of first degree murder (Pen. Code, § 187) and sentenced to state prison.[1]

There is no issue regarding the sufficiency of the evidence to sustain the conviction. Indeed, appellant confessed to the crime and also admitted in court that he struck the fatal blows. His defense was solely diminished capacity based primarily on consumption of an excessive quantity of amphetamine pills and alcohol. The jury, by the verdict, rejected the defense and that conclusion is supported by ample expert and other evidence.

The alleged errors upon which reliance for reversal is based are: (1) improper admission of a tape-recorded statement to the police taken November 21, 1974; (2) the use of a tape-recorded statement taken November 22, 1974, by the police in violation of *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) for impeachment purposes; (3) the improper admission into evidence of color photographs of the victim taken at the scene of the crime; and (4) instructional error.

The sadistic and depraved conduct of appellant and his wife surrounding the commission of the murder need only be summarized and may be limited to that necessary to the disposition of the issues on appeal.

The victim's (Corky Stuhaan's) desecrated body was found in his apartment on September 22, 1974. His skull had been smashed by multiple blows, his throat had been cut from ear to ear, and his penis, testicles and scrotum had been removed together. The castration of the victim was performed very carefully and very similar to the way a surgeon would have approached it, as evidenced by the precise sharp-line dissection, the symmetry of the incision and the fact the abdominal wall was not severed. It had the appearance of a planned procedure. According to the experts, the probable immediate cause of death was asphyxia resulting from total destruction of the brain caused by approximately four blows to the head by an object like a hammer. One of the experts said the back of the victim's brain was like "scrambled eggs." The victim probably died within seconds from the head wounds,

---

[1] In a separate trial Jentry's wife, Karen, was also convicted of first degree murder of the same victim and that judgment has been affirmed on appeal and is now final.

and it was unlikely that the victim could have survived "more than a minute, perhaps two minutes" from the blows to the head.

Appellant was arrested on November 19, 1974, and gave a tape-recorded statement to the police on November 21, 1974, confessing his involvement in the murder. On the same date he went to a mountain location with the police and recovered the private parts of the victim from the place he had buried them. Appellant also took the officers to the cotton gin where he was employed and gave to them two ball peen hammers, one of which was the murder weapon. The police also recovered a pocket knife which was in appellant's possession at the time of his arrest and which was identified as the knife used to sever the victim's genitals. A kitchen knife identified as the knife that was used to slit the victim's throat was also recovered from appellant's mobilehome. It appears over a period of time appellant and his wife had engaged in escalating deviant sexual experimentation and conduct, including sadistic behavior such as infliction of pain on each other in connection with sexual activity. They had over a period of six months to a year fantasized about torturing someone for sexual satisfaction, including castration of a male.

At the trial appellant testified that on the night of September 21, 1974, after consuming a large quantity of amphetamines and some beer, he and his wife discussed realizing their fantasy of killing someone and decided upon their friend, Corky Stuhaan, because Stuhaan knew them well and would let them into his apartment. He admitted that in the past talk of castration had been included but denied they specifically discussed castration on that particular evening. He went to the cotton gin where he worked and obtained a hammer. At the suggestion of appellant, appellant and his wife wore old clothes so he could dispose of them afterwards. Appellant also took along a pair of gloves so as to leave no fingerprints and to wipe the apartment clean.

They parked a few blocks from the victim's apartment and walked there. After they had talked with the victim for a while, appellant's wife offered to give Stuhaan a back rub on the floor. Shortly after the victim had laid down, appellant hit the victim on the head with the hammer several times. At the request of his wife, appellant then turned the victim over and went into the kitchen and bathroom to wipe off fingerprints. After returning and on his way out of the apartment he noticed that the victim's throat had been cut and his genitals excised. He denied that he had seen or done the cutting. During the walk back to the car appellant's wife mentioned she had the victim's genitals in her purse in a plastic bag.

Thereafter they returned to their trailer home and washed themselves and the various items involved in the crime. Appellant took their clothes to the gin and burned them. Later in the early morning of September 22 they took the genitals to the mountains and buried them.

Appellant was impeached by an officer's testimony that appellant had made several verbal statements to them on the way to and from the mountains to recover the genitals to the effect that he had done the whole thing. He was also impeached with a statement given to the police on November 22.[2] He admitted that his wife could have mentioned castration and the use of the victim's genitals for sex before going to the victim's house on the night in question, but he does not remember. He also stated that he cut the victim's throat and that he and his wife had taken the plastic bag to Stuhaan's in which to place the victim's genitals.

In the November 21 tape-recorded statement which was played to the jury, both for impeachment and as substantive evidence (see Evid. Code, § 1235), he admitted the reason for the murder was drugs and sex and that he cut the victim's private parts off with his pocket knife and that the private parts were taken out of the apartment in a plastic bag that may have been taken there or may have been found in the apartment. He admitted the whole thing was premeditated and that there were sexual aspects to the scheme, and stated that his wife did not do any of it.

DISCUSSION

Appellant first urges that the November 21, 1974, statement should have been excluded from evidence because it was involuntary and obtained in violation of his right to counsel.

Appellant was arrested at approximately 7:30 p.m. on November 19, 1974, and was taken to the police department. At approximately 8 p.m. he was given his *Miranda* warnings, which rights he declined to waive, stating that in view of the seriousness of the case he thought he ought to consult an attorney first. The police immediately halted their discussion with him. Appellant was permitted to use the telephone and called his father-in-law, Mort Kibbler, concerning arranging for an attorney. Appellant stated that his father-in-law would do something about an attorney the next morning. Appellant was contained in a holding cell

---

[2]As will hereinafter appear, the statement was introduced only for impeachment purposes because the court had ruled it was taken in violation of *Miranda (Miranda v. Arizona, supra,* 384 U.S. 436). (See *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643].)

until 10:30 p.m. when he was transported to the Tulare County jail. Between 1:30 a.m. and 2 a.m., during his booking into the Tulare County jail, appellant requested and was permitted to use the telephone. He called his mother, Mrs. Tony Serpa, Jr., and asked her to find someone to take his place at the gin the next day.

On November 20, 1974, at the request of appellant's wife, he was transported from the Tulare County jail to the Visalia Police Department where he was allowed to meet with Mrs. Jentry at approximately 7:15 p.m. When appellant was led into the room with his wife, Mrs. Jentry stated, "Honey, I have told them about it, but they don't have a f . . . thing. Keep your mouth shut and we'll beat this." Appellant responded, "What are you talking about?" Karen then said, "You know what I am talking about. I have already told them about it, but they don't have any evidence, and they can't make us. Keep your mouth shut and hang in there." Appellant kept pushing her away and asking her "What are you talking about?" The entire meeting lasted approximately 15 minutes. After the meeting appellant asked Agent Sanders what Mrs. Jentry was talking about and Sanders responded that he could not talk to him about it any further because appellant had refused to waive his right to have an attorney present. Appellant was returned to the Tulare County jail at approximately 8 p.m.

On November 21, 1974, at approximately 9:35 a.m., appellant was returned to the Visalia Police Department to complete the necessary booking procedures, including fingerprinting and photographing. Appellant asked an officer if anyone had attempted to contact appellant or if the officer had any knowledge of anyone obtaining legal services for him. The officer advised appellant that he knew nothing about an attorney for appellant, but offered to permit appellant to use the telephone to call anyone he chose. The officer took appellant to an office where appellant was allowed to make as many telephone calls as he wished. Appellant called his mother-in-law, Ruth Kibbler. The officer testified he heard no reference to an attorney during the entire conversation. Appellant asked the officer to talk to Mrs. Kibbler, which the officer did, but again there was no mention of an attorney by Mrs. Kibbler. As soon as appellant finished the telephone conversation, he told the officer he wanted to get the whole affair over with as quickly as possible. The officer told appellant the only way he could have a conversation with appellant was if appellant waived his rights. Appellant indicated his willingness to waive all rights and stated that he did not need the presence of an attorney.

Appellant was given a waiver form to sign after the officer read it aloud to him. Appellant signed this form and officers proceeded to take a tape-recorded statement from him at approximately 10:20 a.m., concluding at approximately 11:05 a.m.

At approximately 4:35 p.m. appellant called Adolph Feierbach, the family attorney of appellant's wife. Appellant indicated to Feierbach that he had given a statement to police. An officer spoke to Attorney Feierbach over the telephone and Feierbach expressed a desire to be present at the station. A vehicle was dispatched by the officer to transport him there. A meeting involving appellant's wife, appellant, and Attorney Feierbach occurred shortly thereafter. Appellant stated, "Everything is all right, Baby. Everything is going to be fine." "It's all over Karen. It's all over. I have told them."

Appellant testified during a motion to suppress hearing, out of the presence of the jury, that Lieutenant Jump had told him in the coffee room on the night of his arrest, "Von, we know you done it, and why don't you talk to us." He also stated that Captain Marshall said to him, "I am not going to get off your back until I crack you," or "We're not going to get off your back until we bust you." Further, appellant claimed that Officer Dunn stated to him on the return trip to the Tulare County jail, "Do you know that Karen has laid it all on your shoulders," or "Brother, she's laid it all on your shoulder." Appellant at that time said he responded, "What's this all about?" Agent Sanders stated, "Von, we can't talk to you unless you waive your rights." Appellant maintained in his testimony that the reason he chose to make a statement to police on November 21, 1974, was his frustration at not being able to obtain an attorney. He stated he just gave up.

The prosecution produced the various persons to whom appellant ascribed the foregoing statements, and they all denied making such statements to appellant.

Appellant contends that the entire course of the police conduct set forth in the narrative above resulted in appellant's free will being overborne and thus compelling him to make an involuntary statement.

Nonetheless, appellant is unable to point to any indicia of coercion in the circumstances of appellant's arrest and the subsequent statements he made to police. Police immediately stopped questioning appellant upon his indication that he wished to have an attorney and never did resume that questioning until approached by appellant himself expressing a

desire to waive his right to the presence of an attorney. There is no indication in the record of any physical coercion. The record does not reflect that the police failed to move with sufficient alacrity to have appellant arraigned. ■ Appellant cites no authority that police are required to immediately arrange for an attorney for a defendant who is in custody. The cases merely require that the police not approach the defendant for further interrogation, except in special circumstances. There is nothing to prevent the police, though, from taking a statement from a defendant who has once refused to waive his *Miranda* rights and then later approaches them about making a statement. (*People* v. *Ireland* (1969) 70 Cal.2d 522, 536 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719-720 [68 Cal.Rptr. 817, 441 P.2d 625].) ■ The trial court did not err in holding the statement was not involuntary.

Nor was the statement of November 21 taken in derogation of appellant's Sixth Amendment right to counsel. The statement was volunteered by appellant and was given in the preinformation stage of the proceedings. In *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 185-186 [133 Cal.Rptr. 511, 555 P.2d 297], the Supreme Court held that *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], which stands for the proposition that a statement surreptitiously elicited by police after indictment and after the defendant is represented by counsel without the presence of counsel or the waiver thereof is inadmissible, does not apply to the investigatory phase of criminal proceedings, that is, to interrogation before charges are filed. This court stated in *Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 701-702 [103 Cal.Rptr. 379], a case very similar factually to the case at bar: ". . . no reason appears why, under circumstances such as those existing in this case, a defendant may not waive his right to have his attorney present when he volunteers a statement which in no way was initiated or requested by the police or induced by police pressure, psychological or otherwise."

ERROR IN USING APPELLANT'S NOVEMBER 22, 1974,
STATEMENT FOR IMPEACHMENT

On November 22, 1974, appellant, with his wife, was transported to the Visalia Municipal Court for arraignment at 10 a.m. Attorney Feierbach represented the Jentrys at the arraignment. After the arraignment Officer Sanders approached Attorney Feierbach with appellant present and advised the attorney he intended to take appellant back to the police department for a further taped interview. According to Agent

Sanders, Attorney Feierbach responded that was all right and gave no indication he had any objection or wished to be present. Attorney Feierbach testified he recalled no contact with Agent Sanders after the arraignment and did not recall giving Sanders permission to talk further with appellant after the arraignment. Attorney Feierbach speculated that had he been so approached his training and experience would have prevented him from giving such consent.

Officers then returned appellant to the Visalia Police Department where he was again advised of his *Miranda* rights and chose to waive them. A further tape-recorded statement was taken.

This statement was suppressed by the trial court on the ground that though voluntarily given it was given in violation of appellant's *Miranda* right to counsel. The ruling was apparently based either on the attorney not considering himself to represent appellant's interests or rendering incompetent advice to appellant in raising no objection to the police further questioning appellant after his arraignment.

■ Parts of the November 22 statement were used during cross-examination of appellant for impeachment only pursuant to *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] and *People* v. *Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 372, 524 P.2d 844]. The statement was used on October 10, 1975, upon which date both *Harris* and *Nudd* expressly permitted statements taken in violation of *Miranda* to be used for impeachment purposes only. In *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], filed February 6, 1976, the California Supreme Court overruled *Nudd,* declared *Harris* was not persuasive in California on state constitutional grounds, and held such statements could not be used for any purpose. The opinion was made applicable only to trials which began after the date the opinion became final. Accordingly, since appellant's statement was used on October 10, 1975, the court correctly permitted its use for impeachment purposes only.

Appellant argues that the November 22 statement was not made in violation of *Miranda* but rather in violation of *Massiah* v. *United States, supra,* 377 U.S. 201. The *Massiah* case, however, is distinguishable from the case at bar. In *Massiah,* the defendant had been charged, arraigned,

counsel appointed for him, and released on bail. While the defendant was out on bail, the police fitted an undercover agent with electronic transmitting devices and directed the agent to engage the defendant in conversation. The undercover agent did so and elicited incriminating statements from the defendant, which were listened to and recorded by federal agents parked in a vehicle a short distance away. The court held that this police activity violated the defendant's Sixth Amendment right to counsel. In *Massiah,* the obvious problem was that the police provided the defendant with no opportunity to waive his right to the presence of counsel because he was unaware that the police were interrogating him and listening to his words. A similar situation occurred in *People* v. *Arguello* (1965) 63 Cal.2d 566 [47 Cal.Rptr. 485, 407 P.2d 661], which adopted the *Massiah* rule.

In the case at bar, on the other hand, the police made no effort to avoid appellant's exercise of his right to counsel. Both appellant and his counsel advised police that they did not wish to assert appellant's right to have an attorney present. Appellant himself explicitly waived his right to the presence of an attorney. Apparently the trial court entertained some doubt about whether appellant had made a knowledgeable and intelligent waiver. If any right of appellant was violated it was his *Miranda* right to have counsel present unless he makes a knowledgeable and intelligent waiver of that right. Therefore, this case is governed by *Harris* v. *New York,* standing for the rule that a statement taken in violation of a defendant's *Miranda* rights is admissible for the purpose of impeaching his testimony at trial, so long as the statement is otherwise trustworthy.

### The Color Photographs

Over defense objection the prosecution was permitted to introduce into evidence a series of five color photographs taken of the victim at the scene of the murder. One of these photographs was a 14- by 17-inch enlargement of one of the other four photographs, which displayed the genitalia area of the victim. Appellant contends these pictures were gruesome and inflammatory and thereby prejudiced the jury against the defendant.

In *People* v. *Seastone* (1969) 3 Cal.App.3d 60 [82 Cal.Rptr. 907], this court summarized the essence of the applicable legal principle: "Granted that the photographs were gruesome, that fact does not render them inadmissible. The fact that gruesome photos may prejudice a

defendant in the eyes of a jury does not, alone, render them inadmissible. . . .

"· · · · · · · · · · · · · · · · · ·

"The question, therefore, is whether the photos have probative value and are offered and admitted for that purpose, or whether their primary purpose is to inflame the jury against the defendant. The question is one for the trial court, and, in the absence of a clear abuse of that court's discretion, the admission of such evidence will not be disturbed on appeal." (3 Cal.App.3d at pp. 64-65.)

Such photographs have been properly admitted to show malice (*People* v. *Murphy* (1972) 8 Cal.3d 349, 365 [105 Cal.Rptr. 138, 503 P.2d 594] (cert. den., 414 U.S. 833 [38 L.Ed.2d 68, 94 S.Ct. 173]); *People* v. *Manson* (1976) 61 Cal.App.3d 102, 159 [132 Cal.Rptr. 265]; *People* v. *Seastone, supra,* 3 Cal.App.3d 60, 66) and to assist the autopsy surgeon in explaining his findings both as to the location and the description of the wounds (*People* v. *Murphy, supra,* 8 Cal.3d at p. 365; *People* v. *Elmore* (1914) 167 Cal. 205, 212 [138 P. 989]; *People* v. *Parks* (1973) 32 Cal.App.3d 143, 155 [108 Cal.Rptr. 34]).

█ In the case at bar the photographs are indeed gruesome and inflammatory. Nonetheless, they are relevant to the issue of malice and highly probative on the issue of diminished capacity. Specifically, the care and precision with which the wound was inflicted to the genitals speaks to the issue of intent, malice and the mental capacity of the person doing the cutting. Finally, these photographs were used by the autopsy surgeon in explaining the nature and extent of the wounds received by the victim.

## FELONY MURDER INSTRUCTIONAL ERROR

In addition to the theory of deliberate and premeditated murder, the case was submitted to the jury on the theory of first degree felony murder with mayhem as the underlying felony. In this regard, the judge gave CALJIC No. 8.21[3] and CALJIC No. 9.30.[4]

---

[3]CALJIC No. 8.21 as given read as follows:
"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of mayhem, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree.
"The specific intent to commit and the commission or attempt to commit such crime must be proved beyond a reasonable doubt." (See Pen. Code, § 189.)
[4]CALJIC No. 9.30 provides:
"Every person who unlawfully and maliciously deprives a human being of a member

■ Appellant's trial counsel objected to the giving of these instructions, stating: "With reference to instruction 8 point 21, the felony-murder instruction, I argued yesterday to the Court that also in connection with that instruction 9 point 30, the definition of mayhem, that this again is not a case involving mayhem for two reasons. One, there was no evidence of specific intent to commit mayhem. And two, the definition of mayhem itself requires the act to be done to a human being. The evidence here is unequivocal essentially that Mr. Stuhaan was dead at the time any facts [*sic*] amounting to mayhem were committed. Therefore, cannot be considered to be a human being." The objection was overruled.

The contention that there was no evidence of specific intent to commit mayhem may be quickly disposed of. ■ While mayhem is not a specific intent crime (*People* v. *Garcia* (1970) 5 Cal.App.3d 15, 18-19 [85 Cal.Rptr. 36]), specific intent to commit mayhem must be proved to support a conviction of first degree murder grounded upon the felony-murder rule. (*People* v. *Sears* (1965) 62 Cal.2d 737, 744-745 [44 Cal.Rptr. 330, 401 P.2d 938].) ■ The evidence in the instant case has heretofore been recited in detail and reiteration of it here would serve no purpose other than to extend this opinion. Suffice it to say the recited evidence overwhelmingly establishes that the appellant and his wife intended to consummate the mayhem herein as a part of a long-discussed and premeditated macabre scheme and plan to do precisely what was accomplished; and that the acts of preparation and advanced planning as well as the steps taken to cover up their tracks corroborate and support the admissions of the appellant.

Assuming, contrary to appellant's admissions before trial, that his testimony at trial was to be accepted to the effect that not he but his wife actually performed the excision of the genitals, he nonetheless would have a principal's liability as an aider and abettor. Instructions upon the doctrine of aiding and abetting were properly given to the jury.

of his body, or disables, disfigures, or renders it useless, or who cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem.

"To constitute the crime of mayhem the injury must have been inflicted by the accused as a result of an assault upon the person injured.

"An assault is an unlawful attempt, coupled with a present ability, to cause bodily injury to another person by means of physical force.

"The term 'maliciously,' as used in this instruction, means an unlawful intent to commit a physical injury upon another person." (See Pen. Code, § 203.)

■ Turning to the second contention, it must be conceded that the crime of mayhem as defined in Penal Code section 203[5] must be committed upon a live human being. (See *People* v. *Orcalles* (1948) 32 Cal.2d 562, 574 [197 P.2d 26]—Edmonds, J., dis.)

The evidence in this case shows that the brain damage from the initial hammer blows was so extensive as to probably cause death within seconds, and certainly not longer than two minutes. The excision of the genitals followed immediately upon the heels of the head blows. It is apparent that the victim either died during the cutting or was dead before the removal of these appendages commenced. We have concluded, however, that the fact that the victim was dead does not render inapplicable the felony-murder doctrine when, as here, the blows causing the death and the maiming took place as part of one continuous transaction. (See *People* v. *McGrath* (1976) 62 Cal.App.3d 82 [133 Cal.Rptr. 27].)

In *McGrath* the defendant was convicted of first degree murder (Pen. Code, § 187) and grand theft person (Pen. Code, § 487, subd. 2). The evidence showed that the victim had been shot and then robbed by the defendant and that the bullet had caused instantaneous death. The defendant contended that he could not be guilty of grand theft person because the evidence conclusively showed that the victim was dead at the time his money was taken. Citing *Carey* v. *United States* (D.C.Cir. 1961) 296 F.2d 422 [111 App.D.C. 300] and the Washington State Supreme Court case of *State* v. *Coe* (1949) 34 Wn.2d 336 [208 P.2d 863], the court held that if the death and the theft from the victim's person are so connected as to form one continuous transaction, the taking nonetheless constitutes theft from the person. The court said: "The factual sequence of events developed at trial is conclusive that the death of Markell and the theft of money from his person were so connected as to form but one continuous transaction. It is the invasion of personal rights and not the defilement of a corpse that occurs when a theft is perpetrated immediately after killing the victim. The fortuity that the victim may be dead rather than simply unconscious or unaware of the theft does not make the crime any less personal. The killing of a human being is the ultimate personal invasion; one who kills and then steals from the victim cannot reasonably be said to be stealing from a corpse." (*People* v. *McGrath, supra,* 62 Cal.App.3d at pp. 87-88.)

---

[5]Penal Code section 203 provides: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

We are unable to perceive any rational distinction between the reasoning in *McGrath* and the case at bench. Under the factual matrix of this case, neither the appellant's guilt nor the application of the felony-murder doctrine should depend upon the circumstance that appellant's attack was so vicious as to kill the victim, rather than merely render him unconscious, before completing the act of removing the genitals, the latter being the motivation for the killing to begin with.

Having disposed of the cause on this ground, we need only mention in passing an alternate ground for affirmance of the judgment. Having hit the victim on the head for the purpose of facilitating the excision of the victim's genitals, the fact that the victim died from the blows before the excision was started or completed would be irrelevant in that the killing would have occurred in an attempt to perpetrate mayhem. By the express terms of Penal Code section 189, an attempt to perpetrate one of the enumerated felonies in that section can form the basis for the application of the felony-murder doctrine.

The judgment is affirmed.

Gargano, J., and Franson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 4, 1977.