[Crim. No. 30630. Second Dist., Div. Two. Jan. 10, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LEE HAWKINS, Defendant and Appellant.

**COUNSEL**

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Richard A. Curtis and Joseph Levine, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Karl J. Phaler and Cecilia H. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROTH, P. J.**—Appellant and his brother sadistically murdered their 75- and 79-year-old grandparents. The appeal is from a judgment convicting appellant of two counts of murder and two counts of grand theft; one

count of murder and the grand theft convictions were ordered merged with the remaining count of murder.

The Attorney General's summary of the facts suffices as a background:

On Monday evening, March 1, 1976, appellant Robert Hawkins (hereinafter Hawkins) and his brother Michael went to visit their grandparents Cleo and Pearl Hawkins at their house at 9907 Saticoy. Cleo and Pearl were 79 and 75 years old respectively.

Hawkins became angry at comments Pearl made. He called her into the bathroom telling her the toilet was overflowing. As she entered the room, he grabbed her and they fell to the floor. Hawkins tried to choke her. Michael took Hawkins' knife from his belt and cut Pearl where Hawkins told him to. Hawkins then took the knife and cut Pearl's throat. Pearl, however, continued to make noises so Hawkins put a cloth over her face to try to stop the sounds.

Cleo was in bed and called for Pearl. Hawkins went to him, shook his hand, said goodbye, then grabbed him. Hawkins beat on Cleo's chest hoping to bring on a heart attack. Using the same knife used on Pearl, one of the brothers cut Cleo's throat. Using another knife, Hawkins tried to stab him in the stomach. The knife only bent. Cleo continued to breathe so Hawkins put rags around his neck and face.

Hawkins washed up the bathroom and then the brothers searched the house for money. They took all the money they could find as well as two Masonic rings. Hawkins found the keys to their grandparents' car in Pearl's purse. Hawkins and Michael left around 1 a.m. and drove the car to Sambo's Restaurant.

The two men were arrested in Lancaster in their grandparents' car four days afterward. A knife; its sheath; and a belt found with the men had bloodstains of the victims' type. Coins and a ring belonging to one of the victims were also recovered in the car. En route to the Los Angeles police station, Sergeant Gastaldo, the transporting officer, told appellant that he would not discuss the case.[1] However, appellant said: "I want

---

[1]Gastaldo testified:

"A. I told him en route back to North Hollywood that we would discuss about anything there was to discuss such as the sky, the weather, anything, but not about the case, that we did not want to talk about the case until we could get to North Hollywood.

"Q. How soon after that statement that you made to him did he make this statement to

them all to know. I want everyone to know. I want them all to know why we killed our grandparents." Following his arrival at the North Hollywood station, appellant made a full confession after a concededly adequate *Miranda* warning was given.

Prior to the commencement of the prosecution's case-in-chief, a pretrial hearing was held concerning the voluntariness of appellant's confession. The trial court denied appellant's suppression motion finding that appellant's statement to Gastaldo in the police car was spontaneous and further finding that he made a knowing and intelligent waiver of his constitutional rights. However, the trial court did not indicate whether its findings on the voluntariness of appellant's statements were based on a preponderance-of-the-evidence standard or on a finding that the statements were voluntary beyond a reasonable doubt. Appellant's sole contention *re* the confession is that the latter standard should have been applied and that, in view of some uncertainty in the law which of the two standards applies,[2] it cannot be presumed that the trial court decided the issue in light of the "reasonable doubt" test.

Both counsel agree that the question of the proper standard is now before the California Supreme Court in *People v. Jimenez.** It is also conceded that the California Courts of Appeal have been following *Lego* (see fn. 2). (*People v. Moreno* (1976) 61 Cal.App.3d 688, 692-693 [132 Cal.Rptr. 569]; *People v. Barrow* (1976) 60 Cal.App.3d 984, 900 [131 Cal.Rptr. 913]; *People v. Hutchings* (1973) 31 Cal.App.3d 16, 19 [106 Cal.Rptr. 905].)

We set forth the trial court's discussion of the evidence on the issue of voluntariness in its entirety:

"THE COURT: With regard to the defense argument, actually the argument is inconsistent with the defendant's own testimony. He said he was scared and defense counsel is arguing he was lulled in a sense of security by a show of friendship, so you can't really have both statements as I see it.

---

you regarding he wanted the whole world to know?

"A. Approximately five minutes, and I am judging that from the time we left Antelope Valley station and it was right after we got on the freeway."

[2]*Lego v. Twomey* (1972) 404 U.S. 477 [30 L.Ed.2d 618, 92 S.Ct. 619] indicates that the test should be that of preponderance of the evidence while, e.g., *People v. Stroud* (1969) 273 Cal.App.2d 670 [78 Cal.Rptr. 270] holds for the reasonable doubt standard.

*Reporter's Note: Hearing granted, August 12, 1977 (Crim. 20125).

"The Court would find actually that number one, I don't doubt he was tired, but everything else indicates that he was quite conscious.

"He was quite conscious of his surroundings and what was going on about him. He was quite responsive to all of the questions asked.

"The Court will take into consideration Exhibit 7, I believe it is, for identification, the typed, transcribed portion of the tape and was stipulated here for purposes of these hearings that was reasonably accurate transcription of the tape itself.

"As I say, he was reasonably responsive to all questions indicating he had his wits about him. There was nothing to indicate he dozed off during the trip or interview, albeit he was tired, although I don't think that was sufficient to negate his consciousness.

"The Court finds he was very aware of everything going on about him. As far as being lulled, if we are going to discuss that, I don't know there is anything constitutional or case-wise which says the officers can't be friendly to somebody. They can't come off like the enemy, no call for it for any purpose so I don't think that that argument is actually valid. Insofar as the threat, it may well have been that Sergeant Gastaldo may have said something he may have forgotten now along the lines, 'don't try anything along the trip and we will get along fine,' than just to promote a secure and safe trip back to the Los Angeles area from the high desert, but it certainly was not, even by the interpretation of this young man, put on any threats about having to make any statement or incriminate himself in any way, shape or form.

"The defendant did indicate a great willingness to talk. By his own admission, he said that he admits that he made such a statement on the way down and he was just talking to himself, so obviously, that was his thinking. If he was talking to himself, obviously it is not responsive to any question and his general demeanor, the cooperation during the interrogation indicated a great sense or desire to talk, I suppose whatever psychological reason it is to get it off his chest or anything else.

"He seemed to understand his rights. He indicated he had heard them before, and they were repeated to him very clearly, and he responded very clearly, so the Court would—by the way, he, himself, admits there were no threats and there was no evidence that any offers or reward of immunity were made to him. So, the Court would find that he did make

a knowing and intelligent waiver of his constitutional rights, that the interrogation was free and voluntary, that really, what it seemed to come down to, considering what happened at the time and his testimony is he just wished he had not made the statement now, but, in fact, he did make the statement, and under the conditions as indicated, the motion to suppress his statement for either ground would be denied."

The quoted remarks demonstrate that the trial court was convinced beyond any doubt that the statements were voluntary and spontaneous. Accordingly, it is unnecessary to reach the issue raised by appellant's contention.

■ Appellant also contends that the trial court should have instructed the jury on diminished capacity. The asserted evidentiary support for such instructions is summarized in appellant's brief:

"Although appellant presented no defense case at trial, the crucial element of the prosecution's case-in-chief consisted of the introduction into evidence of appellant's confession to the police. Appellant submits that careful scrutiny of this confession reflects an adequate basis for the giving of the requested diminished capacity instruction.

"In the confession, appellant not only referred to the fact that he had been drinking, but also gave several indications of his defective mental state. Thus, at the fifth and sixth lines of page 3, appellant indicates not only that he and his brother had consumed a few beers *before* they went over to their grandparents' house, but that possibly a few beers also had been consumed 'there' (presumably meaning at the house). Then, appellant indicated that at the time he first grabbed his grandmother (first of the two victims), he was just 'flipped out'. Although the police interrogator chose not to delve into why appellant had flipped out, it would certainly be reasonable to draw an inference that this was based on intoxication. Furthermore, this statement also presents some evidence of a defective mental state.

"Later in the confession there are several instances in which appellant made references in psychological terms and effectively indicated the deficiencies of his mental state at the time of one or both of the killings. Thus, he indicated that his grandmother's noises were 'making [him] go nuts', twice stated that he was 'getting paranoid', and further indicated that he was 'freaking out'."

We agree with the trial court that there was no evidence deserving of any consideration that would have warranted instructions on intoxication or diminished mental capacity. Stray remarks about "flipping out" and a few beers without *any attempt whatsoever* to show that appellant's capacity was diminished would not have justified the instructions sought. Nothing in the confession or any other evidence in the record equates with a minimal showing of diminished capacity. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 151 [125 Cal.Rptr. 745, 542 P.2d 1337].)

■ Appellant's complaint about the introduction of photographs showing the victims is misplaced. The photographs showed the manner in which the victims were killed, the condition of the bodies when the police arrived, and the nature of the wounds inflicted. As such they were highly probative on the issue of malice and the degree of the crime. (*People* v. *Jentry,* 69 Cal.App.3d 615, 626 [138 Cal.Rptr. 250]; *People* v. *Long,* 38 Cal.App.3d 680, 689 [113 Cal.Rptr. 530]; *People* v. *Parks,* 32 Cal.App.3d 143, 155 [108 Cal.Rptr. 34].) The ruling to admit them was in the discretion of the trial court.

The judgment is affirmed.

Fleming, J., and Beach, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 9, 1978.