[Crim. No. 2091. First Appellate District, Division One.—May 22, 1940.]

THE PEOPLE, Respondent, v. HUSTON BURNETTE, Appellant.

218

William F. Herron for Appellant.

Earl Warren, Attorney-General, and F. Walter French, Deputy Attorney-General, for Respondent.

PETERS, P. J.—Defendant appeals from a judgment of conviction of rape by force and violence and from the order denying his motion for a new trial. This court has already passed upon two preliminary proceedings related to this appeal. In *People* v. *Burnette,* 34 Cal. App. (2d) 663 [94 Pac. (2d) 399], upon petition of appellant, a writ of *supersedeas* pending the appeal was granted on the ground that an examination of the reporter's transcript demonstrated that the appeal was not frivolous. Thereafter, in *Ex parte Burnette,* 35 Cal. App. (2d) 358 [95 Pac. (2d) 684], a writ of *habeas corpus* based on a claim of excessive bail pending appeal was denied.

Appellant and Remus Godfrey were charged by indictment with kidnaping, rape by force and violence, and with conspiracy to commit rape and conspiracy to kidnap. All the charges were based on the same transactions. Godfrey was acquitted of all charges. Appellant was acquitted of the kidnaping and conspiracy charges, but found guilty by the jury after a lengthy trial on the rape charge. On this appeal it is urged by appellant that:

(1) The evidence of the prosecutrix is inherently improbable and insufficient as a matter of law;

(2) The trial court improperly restricted the cross-examination of the prosecutrix;

(3) The trial court was guilty of misconduct prejudicial to appellant;

(4) The district attorney was guilty of misconduct prejudicial to appellant; and

(5) There was error in the giving of, or refusing to give, instructions.

It is appellant's main theory, confidently, vehemently and exhaustively advanced by him, that the evidence given by the prosecutrix and the other witnesses for the prosecution, was so inherently improbable, and so contrary to the laws of nature, that this court must hold it insufficient as a matter of law; or, if this contention be not sound, that even if such evidence was technically sufficient to convict, it was of so dubious a character that any substantial error or misconduct must have worked a miscarriage of justice. We agree with neither of these contentions. After reading the entire record we are convinced that the overwhelming weight of the evidence supports the judgment.

We do not believe that in this type of case it serves any useful purpose to set forth in the opinion all of the sordid details contained in the record. It will be sufficient to outline the evidence upon which the respondent relies to sustain the conviction.

The rape with which appellant stands convicted was committed in the early morning hours of May 6, 1939. The prosecutrix, Agnes Mae Chattin, testified that she was thirty-one years of age, married, and that she lived with her husband at 450 Duboce Street in San Francisco. She testified that her husband operated an all night cafe at 34 Mason Street, and that his business required him to be present at the cafe

during the early morning hours; that she kept house and occasionally assisted her husband; that on the evening of May 5, 1939, she had dinner with her sister; that at about 1:00 A. M., May 6th, the sister, her husband, a Mr. and Mrs. Church and a friend of her brother-in-law called at her apartment; that drinks were served; that she had two or three whisky highballs; that her guests remained until about 3:00 A. M.; that the sister's husband was a seaman and was sailing for China the next day; that after the departure of her guests she cleaned up the apartment and then decided to visit her husband at his place of business; that she left home with the object of walking a short distance to a taxi stand to get a cab; that she had proceeded but a short distance when, between 14th and 15th on Market Street, Burnette accosted her, and, in spite of her screams, forced her into the back seat of an automobile driven by defendant Godfrey; that Burnette, who was a big man weighing over two hundred pounds, held her by the throat (the prosecutrix weighed under one hundred pounds); that she was forced to lie on the floor boards of the rear seat, Burnette sitting on top of her; that when she offered resistance Burnette hit her on the abdomen or head; that they drove some distance to a hilltop quarry; that there Burnette, after requesting Godfrey to get some gasoline, dragged her from the car, and, after Godfrey had driven away, had intercourse with her against her will; that any resistance on her part met with repeated punches from appellant; that the act continued for a ''long half hour''; that when Godfrey returned he taunted her with the statement that Burnette was full of syphilis; that when Burnette got up she tried to run away and might have escaped had she not lost the heel on one of her high-heeled shoes halfway down the hill; that Burnette caught her, dragged her back and forced her into the automobile; that Burnette then abused her in a disgusting manner, the details of which were recounted by her; that they were at the quarry for about two hours; that at about 6:00 A. M. they left with Godfrey still driving; that instead of returning to San Francisco where all the parties resided, Godfrey turned south towards South San Francisco; that she begged Burnette to release her; that Burnette replied: ''You are not going to get out of this car while you are conscious, you don't think we are that dumb, do you?''; that she was afraid for her life; that on reaching a

certain intersection in South San Francisco the traffic light was against them; that two policemen were in the vicinity; that Burnette ordered Godfrey not to stop and Godfrey stated he would make a right-hand turn through the stop light; that in doing so the car slowed down; that as it did so she jumped out and started screaming; that the two officers came over to the car; that she told the officers she had been attacked by appellant; that appellant told the officers she was drunk and that he would take care of her; that the officers took the entire party to the police station, where she told her story.

Dr. M. R. Oliva, a doctor connected with the South San Francisco Hospital, testified that he examined the prosecutrix a little after 8:00 A. M. on May 6th; that she was then "in a semi-hysterical condition, her clothes torn . . . The first thing I noticed was a large hematoma on the left side of her forehead"; that a hematoma is a collection of blood under the skin, and follows a severe bruise and rupture of a blood vessel under the skin; that the bruise "was the size of an egg"; that "There was a smaller hematoma . . . on the right forehead above the eyebrow and over the face of the nose"; that there was "an abrasion . . . over the right mastoid process, behind the right ear. There was a black and blue spot and a crushed area in the skin at about the midportion of the large muscle in the neck on the right side. There was a large abraded area of the skin over the top of the breast bone." He also testified there were fairly fresh scratches or abrasions in and about the genitals, and that he found a few dead spermatozoa. He also gave it as his opinion that the hematoma that he observed were under five hours old, but that it was within the realm of possibility that they were seven hours old.

Dr. Phyllis Bourne, a doctor connected with the Board of Health of San Francisco, whose official duty it is to physically examine girls who have been assaulted, testified that she examined the prosecutrix at about 2:00 P. M. of May 6th; that at that time "her general condition was only fair. She had bruises on her forehead, nose, arm, left elbow and both legs; and scratch marks chest, throat, both arms and hands, abdomen and the inner side of thigh. . . . Her clothes, especially blouse, grass stained and torn"; that she tested for spermatozoa but found no evidence of their presence; that such test was not a positive test as to whether intercourse had taken

place some hours before; that among other things an acid condition would destroy any such evidence in one-half to two hours. This doctor also stated that there was physical evidence to corroborate the story of the prosecutrix as to the abuse she received from Burnette.

The Municipal Judge who had issued the warrant for the arrest of the two defendants testified that when the prosecutrix appeared before him it was apparent that her face had been bruised.

Nello Lazzari, one of the policemen who was present when the prosecutrix jumped from the automobile in South San Francisco, corroborated the prosecutrix in reference to her physical condition and as to the facts surrounding her escape. He testified he was standing on the corner when he observed the automobile make a right-hand turn through the stop light; that the car was then going about fifteen or twenty miles per hour; that he heard a woman screaming; that he turned around and observed Mrs. Chattin running across the street; that Godfrey got out of the car and told him that he thought she was a prostitute; that Mrs. Chattin was hysterical, the left arm of her coat was torn and her blouse was torn; that she had big welts on the left and right sides of her head and on the nose; that she immediately charged that she had been attacked; that appellant told the officers: "Don't pay any attention to her, she is drunk". The officer stated that the prosecutrix, in his opinion, was not drunk and that he could not smell liquor on her breath; that "If there was anybody drunk, it was Huston Burnette. He was a little intoxicated"; that he then took the entire party to the police station and called the Chief of Police. This officer also testified that when his superior officer arrived he was ordered to take Mrs. Chattin to the scene of the alleged offense; that he took Mrs. Chattin to the quarry and there found the heel of her shoe about halfway up the slope.

Both the Chief of Police and Officer Lazzari testified that Burnette admitted to them that he had had intercourse with the prosecutrix. The Police Chief testified that Mrs. Chattin was not drunk, and testified as to her appearance; that Burnette told him that he had "attacked" the girl. On cross-examination he stated that Burnette used the word "attacked".

After their arrest the two defendants were taken to the San Francisco jail. There they both signed statements. Burnette then, and at the trial, admitted he had had intercourse with the prosecutrix, but then contended, and on the trial contended, that Mrs. Chattin consented thereto.

The appellant and defendant Godfrey took the stand in their own defense. In many details the stories they told the police at the time of their arrest were inconsistent with each other and are inconsistent with the stories they later told on the witness stand. It would serve no useful purpose to recount these inconsistencies. Burnette testified that on the evening of May 5th he had attended a meeting with Godfrey where he had a few glasses of beer; that thereafter he and Godfrey visited various places in his automobile and purchased a half pint of whisky; that they had a few drinks; that some time after 2:00 A. M. they parked in the vicinity of Fillmore and Ellis Streets, some distance from where the prosecutrix testified she was seized; that he got out of the car and observed Mrs. Chattin coming towards him; that she smiled and he accosted her and offered her a drink; that she got in the car and had a drink; that she then consented to take a ride. Both Burnette and Godfrey testified that she then had a bruised forehead, but they did not testify as to other bruises or lacerations, or that her clothing was disheveled or torn. They stated she obviously had been drinking when they first met her. Burnette testified that they took a ride down the Bayshore highway, and drove up to the quarry for a drink; that he then took her for a walk and she consented to the act of intercourse; that thereafter they returned to the car and later, while walking around the quarry, she lost her heel which they could not find; that they then decided to go get a bottle of beer; that they started towards South San Francisco; that on this ride Godfrey, who also testified as to the same fact, with a perverted sense of humor, told the prosecutrix that Burnette had syphilis; that Burnette denied it but that she became angry; that they drove up before a cafe in South San Francisco and stopped; that Mrs. Chattin, without warning, jumped out screaming.

▮ Appellant makes much of the fact that neither Mrs. Chattin's husband, nor the visitors at her home were called as witnesses by the prosecution to corroborate portions of her story, although all were apparently subpoenaed by the prose-

cution. Why they were not produced does not appear. This was a matter that could properly be, and undoubtedly was, argued to the jury—it is entitled to but little consideration on appeal. It might be added that appellant could have subpoenaed the husband, as well as the other witnesses, had he desired. The names of the visitors were disclosed on the first day of an eight-day trial. Appellant had ample time to interview and subpoena such witnesses had he been so inclined.

Appellant argues that it would be impossible for a man weighing more than two hundred pounds to have sat on top of the ninety-seven pound prosecutrix while riding to the quarry, and to have punched her to the extent to which she testified without inflicting physical injuries far more serious than those found by the doctors who examined her following the attack. This was a jury question. The injuries testified to by the doctors were sufficiently serious to not make incredible the story told by the prosecutrix. In fact, she testified that, on July 17th (the first day of the trial), she still had physical evidences of the beating suffered on May 6th.

Appellant further argues that it is beyond comprehension how appellant could have kept up the act for half an hour if there had been the slightest resistance. The prosecutrix testified that she screamed, that she did resist, and that every act of resistance was met with punches and blows. In this state it is not required that the prosecutrix resist as long as strength endures or consciousness continues. The resistance required in each case depends upon the circumstances of that case, such as the relative strength of the parties, the uselessness of resistance, the degree of force manifested and other factors. The resistance of the prosecutrix need only be such as to make nonconsent and actual resistance reasonably manifest. (*People* v. *Cline*, 117 Cal. App. 181 [3 Pac. (2d) 575] ; *People* v. *Cook*, 10 Cal. App. (2d) 511 [52 Pac. (2d) 538].) Not only did the prosecutrix testify as to resistance, but her physical condition corroborates her story. The story is further corroborated by the finding of her heel halfway down the slope where it could not possibly have been had appellant's story been true. There is no merit in the point.

Appellant claims there were houses so near the scene of the offense that any outcry or scuffle must inevitably have been heard by the occupants, and by a man whom the prose-

cutrix testified she observed working on his automobile near by. This point was strongly urged in the trial court. In response to a request of appellant's counsel the members of the jury were taken to visit the scene. These very facts were called to their attention during that visit. Their implied finding on the point cannot be disturbed on appeal.

■ Appellant finds great significance in the circumstance that the fur coat which the prosecutrix wore, and which was torn, the shoe with the broken heel and the pants worn by the prosecutrix at the time of the attack were introduced into evidence, but that the blouse which she wore, and which she claims was grass-stained and torn, the suit she wore, and which she claims was grass-stained, and the stockings which she claimed were badly torn as she was dragged over the rocks, were not produced. The prosecutrix testified she had the suit cleaned and had carelessly destroyed the stockings. Her credibility in this regard was solely for the jury. The sole purpose of introducing such articles would have been to corroborate her story of the beating she suffered, and the condition of her clothes. Both of these matters were amply corroborated by her physical condition and the testimony of the doctors and the police officers.

■ This serves to briefly outline the evidence produced by the prosecution and to indicate the main contentions of appellant in reference to the sufficiency of that evidence to sustain the judgment. It is at once apparent that the evidence is ample to sustain the judgment of conviction. While it is true that in cases of this kind the testimony of the prosecutrix must be carefully scrutinized, and that rape charges are sometimes easily fabricated, nevertheless the story of the prosecutrix in this case is not inherently improbable, and it is corroborated by other evidence. In almost every appeal in a sex case involving abnormal actions on the part of the accused it is contended that such abnormality is beyond belief. It is, of course, not normal behavior for a man to seize a woman by the throat on a well-lighted street, to beat her, to transport her to a rock quarry, to then forcibly rape her, and then to wait until daylight before leaving. But criminal behavior is seldom normal. This woman was beaten and bruised; her clothes were disheveled and torn; her heel was found where she had stated she lost it when trying to escape. These facts were proved by many witnesses. Someone dur-

ing the early morning hours of May 6th brutally beat the prosecutrix. The act of intercourse is admitted. Appellant admits being with her after 3 :00 A. M. He contends her forehead was then bruised but he does not contend that she was in the condition testified to by the doctors and police. No mention of torn and disheveled clothing is made by him. He unsuccessfully tried to convince the jury that the prosecutrix voluntarily went with him and Godfrey to the quarry and there voluntarily submitted to him; that he and Godfrey, both married men, and the prosecutrix, a married woman, then sat around talking for an hour or an hour and a half until daybreak and then went for a ride, and then, without warning, that she jumped from the car and started screaming and immediately charged him with attacking her. It is this story that is inherently improbable, not that of the prosecutrix. This is certainly not a case where the testimony of the prosecutrix is so inherently improbable that as a matter of law it may be held to be insufficient to support the verdict. Nor is it a case where the evidence was of so dubious a character that any substantial error must have worked a miscarriage of justice.

Appellant contends that he was unduly and improperly limited in the cross-examination of the prosecutrix. Early in the cross-examination counsel for appellant asked the witness how many times she had been married, where she had been employed, whether she had worked in various named saloons or night clubs, where she was born and where she had resided prior to coming to California. The trial judge sustained objections to many of these questions on the ground that counsel had not fixed the time, and held that inquiry into the past life of the prosecutrix would not be permitted unless relatively recent. Apparently the trial court was of the opinion that testimony concerning the past of the prosecutrix should be limited to about one year before the date of the offense. However, in spite of the rulings of the trial court, answers to many of the questions asked were in fact given by the witness. She testified that she was married to Clyde Chattin in 1937, and had been married before. She was not permitted to testify as to the details of the prior marriage. She testified that she had been a waitress. After considerable argument objections were sustained as to places where she worked prior to a year before the offense. She

was asked if she worked in various named night clubs in 1934 and 1937. Objections were sustained but, nevertheless, she answered: ''I didn't work in any of these places'', and also stated: ''No, I never worked as a B-girl.'' It is of course true that great liberality should be allowed in this type of case as to the scope of the cross-examination of the prosecutrix, but that does not mean that such cross-examination is unlimited. Evidence of prior acts of intercourse with other men may be elicited on cross-examination for the purpose of disproving the allegation that force was used. (*People* v. *Pantages,* 212 Cal. 237 [297 Pac. 890]; *People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129].) But here the questions were not directed to any prior acts of intercourse. They simply were directed at prior occupations and the past life generally of the prosecutrix. It is the theory of the appellant that these were proper subjects of inquiry in order to test the credibility of the witness within the rule stated in the frequently cited case of *Alford* v. *United States,* 282 U. S. 687 [51 Sup. Ct. 218, 75 L. Ed. 624]. In that case it was held that on cross-examination the *present* residence of the witness could be inquired into in order to identify the witness with his *present* environment in order that the jury could pass on his credibility. But that is far different than inquiring into the entire past life of the witness simply to test credibility. When the evidence does not tend to show prior intercourse within the rule of the Pantages case, *supra,* then a rule of reason must be adopted. The matter must rest largely within the sound discretion of the trier of the facts. Cross-examination is limited generally to the scope of the direct examination (Code Civ. Proc., sec. 2048.) Where the general past life of the witness is not examined into on direct, although the trial judge should give a wide interpretation as to the scope of the direct, he is not required or permitted to allow an inquiry into the entire past life of the witness. This is so because otherwise the past life of the prosecutrix might well become the main issue in the case. So far as the crime here involved is concerned—rape with force and violence—the past life of the prosecutrix is not an issue, as long as it does not involve intercourse with other men. Women who may have worked in questionable places are as much entitled to protection from force and violence as those who may have lived more proper lives. The questions that ap-

pellant's counsel desired answered in the instant case were not nearly as pointed as those involved in *People* v. *Mangum*, 31 Cal. App. (2d) 374 [88 Pac. (2d) 207], where the problem is exhaustively discussed and where it is held that it is not error to exclude such questions. (See, also, *People* v. *Burrows*, 27 Cal. App. 428 [150 Pac. 382].)

■ Some complaint is also made that appellant was restrained from cross-examining the prosecutrix as to whether she owned and could drive an automobile. The theory of the appellant is that, if it developed she did own, and could drive, a car, the jury could properly consider such facts in passing on the credibility of her story that she was seeking a taxicab at 3:00 in the morning. Such testimony would have no tendency to prove or disprove the story of the prosecutrix. Many owners and drivers of automobiles ride in taxicabs. The ruling of the trial court was correct.

■ Appellant also complains that he was not permitted to show, on cross-examination, that the prosecutrix had filed a robbery complaint against these defendants. This charge was apparently never pressed, and the grand jury did not indict the defendants for robbery. The prosecutrix had testified that she had $16 in her purse at the time of the attack and that she had offered this to the defendants if they would let her go. She testified that, although she did not see appellant or Godfrey take this money, while still at the quarry, she charged them with taking it, which charge they had denied. When arrested, a thorough search was made by the police of both defendants and of the automobile and only a very small sum of money was found. Appellant contends that he had the right to show that the witness had sworn to such a complaint in order to show bias and prejudice. Assuming without deciding that such question was proper, a reading of the record demonstrates that the jury had before it all of the facts in reference to this robbery complaint. The limitation on the cross-examination, even if improper, could not possibly have injuriously affected appellant.

■ Appellant contends that the trial court improperly prohibited him from proving on his direct examination, and by medical testimony, that in fact appellant was not afflicted with syphilis. The prosecutrix had testified that while Burnette was still engaged in the act of intercourse Godfrey had returned and taunted her with the statement that Burnette

"was full of syphilis". Obviously, this conversation was admissible as part of the *res gestae*. The prosecution at no time contended that Burnette in fact had syphilis, or that he had infected the prosecutrix with the disease. The issue presented by the testimony of the prosecutrix was whether the conversation had taken place, not whether Burnette had the disease. In fact, Burnette's denial that he had the disease appears several times in the record. The proffered testimony which was rejected would not have directly or indirectly tended to prove or disprove any issue in the case, and was properly rejected.

It is next contended that the trial judge was guilty of prejudicial misconduct. We have read the entire record. It must be conceded that on numerous occasions the trial judge in ruling on evidence, particularly during the cross-examination of the prosecutrix, and during the examination of appellant, made comments which better had been left unsaid. In extenuation it might be said that some of the tactics employed by appellant's counsel during the trial were of a type to reasonably exasperate the trial judge. As to some of these remarks no assignment of misconduct was made. As to others, the trial judge refused to instruct the jury to disregard them at the time they were made. But when instructing the jury at the end of the trial the trial judge not only told them that they were the sole judges of the facts, but also carefully and fully instructed them to disregard any remarks he might have made during the trial, and to disregard any intimation he might have given as to his feelings as to the facts or as to the credibility of any witness.

Undoubtedly, however, the record does contain some remarks made by the trial judge which should not have been made. There can be no doubt that occasionally the judge departed from that attitude of judicial calm which, under our system of law, he is supposed to display. Nevertheless, we are convinced that the making of such remarks, under the facts here disclosed, was not prejudicial so as to require a reversal. After reading the record it is quite clear that the error, if any, must be held to fall directly within the purpose and intent of Article VI, section 4½ of the Constitution.

It is next urged that in the final argument to the jury the deputy district attorney was guilty of flagrant misconduct. It is a fact that in several instances she exceeded

the bounds of proper argument. She stated that in one month sixteen men convicted of rape would come before the prison board to have their sentences fixed, and further, that during her fourteen years' experience in the district attorney's office "in my opinion there probably have been hundreds of convictions on rape cases." These were matters outside the record and no reference should have been made to them. In describing how fortunate Mrs. Chattin was to have secured the opportunity to escape she stated: "And, in the opinion of the District Attorney, I would go so far as to say it is doubtful whether Mrs. Chattin would ever have been seen alive again—" This was assigned as misconduct, but the assignment was overruled and denied. Undoubtedly, the remark about the possibility of the defendants killing the prosecutrix was called forth by her testimony that she feared for her life, and that when she begged Burnette to let her go, he replied: "You are not going to get out of this car while you are conscious, you don't think we are that dumb, do you?" The statement was a fair inference from the testimony. Thereafter, the deputy district attorney several times referred to the defendants as "yellow rats" and made a plea to free San Francisco from men of their ilk. Such invective has no place in a proper argument. This court has recently found it necessary to condemn the all-too-frequent practice of some prosecutors to overstep the bounds of propriety in oral argument. (*People* v. *McChesney, ante*, p. 36 [102 Pac. (2d) 455].) Prosecutors should remember that the accused is entitled to a fair trial, and that they are duty-bound not to take advantage of their official position so as to deprive him of that right. In the instant case, however, in view of the evidence, it cannot be held that the misconduct was of such a flagrant character as to require a reversal.

Some objection is made as to the giving, and the refusing to give, certain instructions. Appellant offered an instruction on reasonable doubt. The court refused to give the proffered instruction, but in other instructions he informed the jury that all of the elements of the offense had to be proved by the state to a moral certainty and beyond a reasonable doubt. He also instructed the jury almost in the identical words of section 1096 of the Penal Code on the presumption of innocence and as to the effect and definition of

reasonable doubt. This is all that was required. (Pen. Code, sec. 1096a.)

Appellant offered another instruction, which was refused, the object of which was to warn the jury of the danger of a conviction on the uncorroborated testimony of the prosecutrix alone. Such an instruction may be permissible where the act of intercourse is denied, and where there are no corroborating circumstances. In the instant case, the act was admitted and the only issue was whether force and violence had been used. The proffered instruction had no proper place in this case.

The appellant also proffered an instruction dealing with oral admissions. The proffered instruction was refused, and in its place the court instructed that: "You are instructed that the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of a party with caution". The instruction given is in the exact words of section 2061, subdivision 4, of the Code of Civil Procedure. In *Hirshfeld* v. *Dana,* 193 Cal. 142 [223 Pac. 451], it was held that section 2061, subdivision 4, *supra,* was unconstitutional, and that the giving of an instruction based thereon was erroneous. (See, also, *People* v. *Tucker,* 28 Cal. App. (2d) 206 [82 Pac. (2d) 73].) But in the Dana case it was also held that such instruction states a mere commonplace within the general knowledge of juries, and that the giving of such an instruction is not prejudicial error.

Appellant contends that the first part of the instruction was prejudicial in that it in effect told the jury to distrust the testimony of the defendants. We do not believe the instruction should have been given, because the two defendants were both charged with the same offenses. Neither was called as a witness for or against the other, but testified solely on his own behalf. However, for that very reason, it is clear no prejudice could possibly have resulted from the giving of the instruction. The defendants did not appear before the jury as principal and accomplice, but as two principals.

There are other allegations of error made in the briefs of appellant. We have considered all of them and find them to be without merit. No useful purpose would be served by setting forth each one in detail. After reading the record herein we are convinced that the case presented by the prosecution is supported by the overwhelming weight of the evi-

dence. The story told by the prosecutrix is corroborated by the surrounding circumstances and by every physical fact capable of corroboration. The story told by appellant, where different from that told by the prosecutrix, is highly improbable and corroborated only by the testimony of the codefendant. We are convinced that any error that may have crept into the record during the long and hotly contested trial was not prejudicial to the rights of appellant so as to require a reversal.

The judgment and order appealed from are affirmed.

Knight, J., and Ward, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on .June 20, 1940. Carter, J., voted for a hearing.