[No. B005553. Second Dist., Div. Seven. Sept. 26, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL L. WILLIAMSON, Defendant and Appellant.

COUNSEL

Paul T. Suzuki, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz, William T. Harter and Patrick T. Brooks, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

POUNDERS, J.*—Following trial by jury, defendant was found guilty of murder in the first degree, the jury further finding the allegation of personal use of a knife to be true. On appeal defendant challenges (1) the trial court's denial of his request to substitute counsel, (2) the introduction of allegedly inflammatory photographs of the victim, (3) the jury's conclusion that defendant used a knife in the commission of the crime, (4) comments of the prosecutor during argument amounting to misconduct, and (5) the trial court's refusal to give instructions relating to manslaughter. In addition, supplemental briefing was submitted on the adequacy of aiding and abetting instructions under *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].

*Assigned by the Chairperson of the Judicial Council.

## Factual Background

### I

### The Crime

Fifteen-year-old Angela Sparks lived in the apartment below that of defendant at 4358 Elizabeth Street in Cudahay. The two-unit apartment house was located toward the back of the lot. At approximately 2 a.m. on November 12, 1982, Angela heard defendant, whom she knew, running down the stairs outside the building. She saw him run to his truck and then back up the stairs. She heard a banging noise approximately 20 to 25 times and a yell.

A little later, Angela heard a noise by the door and looked through her window. The noise sounded like a head hitting on the ground or something being hit with something. She heard someone say something like, "Oh, my God," and then the banging noises stopped. Having awakened her mother, Joyce Sparks, Angela looked outside to see defendant and codefendant Joe Leggio[1] dragging a person down the stairs. The person, who was not moving, was not known to the two women, but Angela had seen the man once or twice when he went to defendant's apartment. The man's head was bouncing on the stairs as defendant dragged him by his arms and codefendant Leggio pushed him by his legs. At that time the victim was still alive and conscious.

The two men left the victim beside a truck where codefendant Leggio began to kick the man's head. Angela said, "Why you [sic] kicking the head like that?" Defendant ran over to the window and said that he and his friend had been drinking and they were trying to slap the friend so that he would wake up because he was throwing up blood. Mrs. Sparks told them to take the man to the hospital, and Angela gave them directions to St. Francis in Lynwood. The two men placed the body in the back of the truck and drove off, returning to the apartment about 15 minutes later without the body. As he was walking upstairs, defendant told Angela that he had taken the man to his wife, who would take care of him.

The victim, Robert W. Miller, was found about 4:10 a.m. by a street sweeper for the City of Huntington Park on Salt Lake Street. The victim's body was lying half in the street and half on the railroad right of way. The blood flow from the victim's head went down into the street. A police officer

---

[1] Defendant's motion to sever having been granted, codefendant Leggio is not involved in this appeal.

responding to a call saw numerous stab wounds to the chest of the victim, and his throat had been slit. There was quite a bit of damage to the victim's head, and one area of the brain was visible and protruding from the skull. The victim was covered by quite a bit of blood.

At approximately 6 a.m. Mrs. Sparks saw defendant with a rag and a hose washing down the steps. Codefendant Leggio assisted defendant in hosing down the sidewalk and driveway before they left. Angela went outside and observed blood on each of the steps. By the steps Mrs. Sparks found small fragments of bone. In the dirt by the driveway she found hair with a piece of scalp still attached to it. Mrs. Sparks and her daughter took this evidence to the Bell Police Department.

Pursuant to a warrant, defendant was arrested at his upstairs residence. Blood was observed smeared on each step of the stairway, on the door jamb, on a fly swatter hanging next to the door, on a bench press, and on the kitchen floor. A large area on the carpet had recently been cleaned and was wet with a pinkish residue. Blood was found in the bed of defendant's pickup truck.

An autopsy performed on Mr. Miller revealed that death was due to two groups of injuries—blunt force injuries, and stabbing and slashing injuries apparently caused by a knife. The blunt force injuries to the head and body included multiple lacerations of the scalp and fracturing of the skull with bone fragments being pushed inward to the brain. The victim's nose was broken. He had been stabbed at least once in the eye and eight or nine times in the throat. His throat was slashed at least four times, and there four slashing wounds to the left side of the neck and three to the right side of the neck. There were more than 10 penetrating stab wounds to the victim's chest.

## II

### DEFENDANT'S ADMISSIONS

On November 14, 1982, Michael Bumcrot, a deputy sheriff for the County of Los Angeles assigned to the homicide bureau, questioned defendant in the Detective Bureau of the Bell Police Department approximately an hour after his arrest. Defendant was advised of and waived his constitutional rights.

Defendant began by saying that he had gotten into something a little more serious than he had anticipated. He began crying right away. After he was quieted by the officers, he told them that he and codefendant Leggio had

gone with the victim to the American Legion Hall on the 11th for free food and beer on Veteran's Day. Later they went to a bar on Atlantic where codefendant Leggio and the victim, Bobby Miller, got into an argument about the victim owing codefendant Leggio $25. Codefendant Leggio told the victim that he would forgive the debt if the victim would give him a dollar so he could buy a beer. The victim said that he would rather go to a market and buy two beers instead.

The victim left toward the market. The two men drove around, saw the victim walking, and asked him to get into the truck with them. Defendant drove his Datsun pickup truck back to his house and they went upstairs. Shortly thereafter the victim fell asleep.

Codefendant Leggio said that they should kill the victim because he was a freeloader. They talked about it for a few minutes, and they agreed that the victim should be killed. Defendant walked over to two windows in the living room which were secured by two approximately 2½-foot pieces of dowel rod like that used to hang clothes in a closet. Each man picked up one piece and walked back to the victim. Defendant was the first to strike the victim. Codefendant Leggio immediately began striking the victim. Both men were striking the victim in the head and face. After four or five strikes, each dowel rod broke.

Codefendant Leggio then told defendant to go down to his truck and get a tree limb that he carried for protection. Defendant did so, and codefendant Leggio struck the victim in the head 10 to 20 times. Defendant saw blood, bone, and hair fly from the victim's head.

The two men carried the victim by the legs and feet down the stairs to the truck, at which time a young girl from downstairs started shouting at them. Defendant walked over to the window and told her that the victim was a friend, that he had gotten sick, and that he was throwing up. He asked for directions to a hospital. The girl told them to take the victim to St. Francis Hospital.

The two men put the victim in the truck and drove to Salt Lake Boulevard in Huntington Park, where they stopped the truck, dragged the victim out of the truck, and placed him near some railroad tracks. They removed defendant's shirt from the victim, and defendant took it back to the truck. He turned and saw codefendant Leggio stabbing the victim in the chest with a buck knife.

On the way back, codefendant Leggio wrapped the knife in the shirt and threw it from the vehicle into some bushes near an Edison station. Back at

the apartment, they cleaned up a little and threw the dowels, some rags, and the tree limb into a dumpster at the K-Mart on Atlantic.

A few hours after the first interview, the officers talked to defendant again in his cell. Defendant stated that he wanted to change one portion of his story. He said that when he was standing next to codefendant Leggio on Salt Lake Avenue as he stabbed the victim, codefendant Leggio handed him the knife and told him to slash the victim's throat. Defendant said he took the knife and slashed the victim's throat because he thought that the victim was already dead.

DISCUSSION

I

THE REQUEST FOR APPOINTMENT OF<br>SUBSTITUTE COUNSEL

■ Relying on *People* v. *Marsden* (1970) 2 Cal.3d 118, 120 [84 Cal.Rptr. 156, 465 P.2d 44], defendant contends that the trial court erred by denying his request for appointment of substitute counsel without allowing him to fully state his reasons for requesting a new attorney. The record fails to support this contention.

The factual setting for defendant's challenge arose on the third day of trial. On the first two days the codefendants moved to sever their trials and were successful. Defendant Williamson then proceeded to traverse the warrants and challenge the admissibility of his confession. Thereafter, at 2 p.m. on the second day of trial, jury selection commenced. It was shortly after 9 a.m. the following day that defendant made his request for substitution outside the presence of the jury:

"THE DEFENDANT: Your Honor, um, I would like to ask a State-appointed attorney under the *People* v. *Marsden* motion for the grounds of inadequate defense [*sic*].

"THE COURT: Why do you say that?

"THE DEFENDANT: I've requested a State-appointed attorney twice already during the time of my first hearing and I've been denied. I can't understand why. I want to have the best defense I can under capital defense [*sic*].

"THE COURT: You wish to say anything, Mr. Beyersdorf [defense counsel]?

"MR. BEYERSDORF: I know of no legal conflict of interest, Your Honor.

"THE COURT: All right.

"Well, we have commenced the trial, Mr. Williamson. I don't know what went on before but at this point your request will be denied. We are in trial. It's not timely. I don't know what went on before, as I say. I just got this case for trial the other day but I will say this, Mr. Beyersdorf is one of the most highly thought of lawyers around here. I don't know if you're aware of that or not. He's probably one of the most experienced lawyers you could have the opportunity to have represent you. .

"THE DEFENDANT: I have a feeling on that, Your Honor, because of my statement. *Mr. Beyersdorf knew from the very beginning that I was guilty. It's just a matter of what degree* and therefore I don't feel that he has put out his full efforts in my defense.

"During the first seven months as my lawyer he told me more than once that he had no time to come down to jail and talk to me." (Italics added.)

It is obvious that defendant was twice given and twice utilized his opportunity to explain the reasons for his request for substitution of counsel. The transcript clearly indicates that the trial judge made inquiry of defendant and listened to his complaints. Nothing more was required under *Marsden.* (*People* v. *Penrod* (1980) 112 Cal.App.3d 738, 745 [169 Cal.Rptr. 533]; *People* v. *Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513].)

Moreover, the trial court had abundant justification for the denial of defendant's request. This request was not timely, occurring during the third day of jury trial well into the selection process. (*People* v. *Molina* (1977) 74 Cal.App.3d 544, 548 [141 Cal.Rptr. 533]; *People* v. *Petty* (1981) 127 Cal.App.3d 255, 260 [179 Cal.Rptr. 413]; *People* v. *Maese* (1980) 105 Cal.App.3d 710, 723 [164 Cal.Rptr. 485].)

Although not directly challenged by defendant on appeal, the remaining reasons for denial of the request to substitute counsel were also substantial. Defendant complained that the deputy public defender had not visited him in jail for the first seven months and that defendant had a feeling that his counsel knew from the very beginning he was guilty and counsel was not putting out his full efforts in the defense.

First, it is not uncommon for a deputy public defender in the County of Los Angeles to be so busy that he cannot visit the defendant in jail. This

does not mean that there are inadequate contacts between the defendant and counsel. (See *People* v. *Walker* (1976) 18 Cal.3d 232, 237-238 [133 Cal.Rptr. 520, 556, P.2d 306]; *People* v. *Terry* (1962) 57 Cal.2d 538, 553 [21 Cal.Rptr. 185, 370 P.2d 985].) Second, defendant's allegation that counsel believed he was guilty does not raise the inference that counsel was not prepared for trial. Defense counsel announced ready for trial and thoroughly litigated the issues in the case. (*People* v. *Terrill* (1979) 98 Cal.App.3d 291, 300 [159 Cal.Rptr. 360].)

Defendant's allegations were insufficient to show that his right to counsel would be substantially impaired without a substitution. (*People* v. *Walker, supra,* 18 Cal.3d 232, 238; *People* v. *Carr, supra,* 8 Cal.3d at p. 299.) Finally, the overwhelming evidence against defendant along with his detailed confession made his conviction inevitable. Beyond a reasonable doubt any denial of his right to effective counsel did not contribute to the conviction. (*People* v. *Lewis* (1978) 20 Cal.3d 496, 499 [143 Cal.Rptr. 138, 573 P.2d 40].)

## II

### INFLAMMATORY PHOTOGRAPHS OF THE VICTIM

■ Defendant objects to the introduction of six allegedly inflammatory photographs of the victim, marked as exhibits 1, 3, and 34 through 37. The People respond that the trial court soundly exercised its discretion in admitting the photographs.

■ The admission of photographs of the victim lies within the discretion of the trial court unless the probative value of the photographs is clearly outweighed by their prejudicial effect. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 859 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Milan* (1973) 9 Cal.3d 185, 194 [107 Cal.Rptr. 68, 507 P.2d 956].) The record reveals that the court carefully examined each of the challenged photographs during the requisite balancing process.

The first photograph depicts the victim as he was found in the street. At the time of registering his objection, the deputy public defender stated: "Your Honor, my request is that the Court view all of the photographs that the District Attorney intends to use and that *we select whatever photographs he needs to use for evidentiary value,* but I'm concerned obviously about the prejudicial and inflammatory effect of the photographs like the one the Court now has in his hand." (Italics added.) Counsel thus recognized that some of the photographs should be used. The trial court ruled that the probative value with regard to the condition of the victim, which was an issue

in the case, outweighed any prejudicial effect and further corroborated the statements made by defendant.

Exhibit 3 depicted a trail of blood from the head of the victim which the prosecution offered to corroborate defendant's statement that the victim's throat was cut at the scene rather than back at the apartment. The trial court again balanced the probative value against the prejudicial effect under Evidence Code section 352[2] and admitted the photograph.

In a much lengthier hearing, the People offered eight photographs of the victim and the trial court eventually admitted only four of the photographs. Under section 352 the trial court excluded a redundant photograph showing the front chest and part of the head. The court further excluded a photograph depicting the wound to the throat area, indicating that the doctor could testify about the slashed throat. Another photograph showing fractures to the skull was ruled inadmissible. Finally, the court excluded a fourth photograph showing the face and the upper chest portion. The court concluded that the prosecution could cover the damage to the throat and the skull through testimony, there being "no issue to skull fractures and pieces being out." The four admitted photographs depicted defense wounds to the hands, stab wounds to the chest and back, and some frontal throat injuries.

The trial court laboriously evaluated each photograph and balanced the probative value against the prejudicial effect as required by *People* v. *Green* (1980) 27 Cal.3d 1, 24-26 [164 Cal.Rptr. 1, 609 P.2d 468], before admitting the six challenged photographs and eliminating four other photographs proffered by the People.

Our Supreme Court has recognized that " 'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant. . . .' " (*People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) Photographs disclosing and corroborating the manner in which the crime was committed are clearly relevant to the issue of malice. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Parks* (1973) 32 Cal.App.3d 143, 155 [108 Cal.Rptr. 34].) ▮ We conclude that the trial court properly exercised its discretion in balancing the probative value of these photographs against the prejudicial effect.

---

[2]Evidence Code section 352 provided: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

## III

## The Jury's Finding That Appellant Used a Knife in the Commission of the Crime

█ Defendant next contends that the jury had insufficient evidence to conclude that defendant used a knife in the commission of the murder in violation of Penal Code section 12022, subdivision (b), which provides in relevant part: "Any person who personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of one year, unless use of a deadly or dangerous weapon is an element of the offense of which he was convicted."

Defendant essentially contends that the killing was complete before he himself used the knife to cut the victim's throat. As the People correctly assert, a reviewing court must presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) In that light we review the relevant evidence.

First, the deputy medical examiner for the County of Los Angeles Coroner's Office responded to an inquiry as to the actual cause of death by stating that where there are "so many injuries, you've got to attribute death to a combination of the effects of all of these injuries." He said that "death was due to blunt force head injuries and multiple stab and slash wounds." Specifically with regard to the timing of the throat injuries, he testified: "The wounds in the throat were quite difficult to make that determination and the best I can say is that they were received somewhere around the time of death but they don't show as much evidence of reaction as, say, the wounds that penetrated into the left chest but they show a little bit more indications of some reaction than the one in the right chest.

"So I'd say those are probably very close to the time of death.

"[DEFENSE COUNSEL]: But you can't say with reasonable medical certainty that they were actually inflicted prior to death?

"A. The throat wounds I don't think I can say with complete certainty that he might not have already been—you know, have expired or just expired when those were being received."

Second, defendant's own testimony at the time of trial was that he was the *last one to use the knife* on the victim. He testified that the codefendant "wanted me to cut the guy's throat." Defendant grabbed the knife, climbed out of the truck, "ran the knife across the guy's throat" and then returned to the truck with the knife before they left the scene.

When the medical examiner's testimony is compared with that of defendant, it may fairly be concluded that defendant lied to conceal his involvement. The medical examiner testified that the wounds in the left chest were inflicted before death and the wounds to the right chest were definitely inflicted after circulation had stopped because there was no hemorrhaging. He could not be as certain with regard to the timing of the wounds to the throat but did conclude that they were received somewhere around the time of death. This conclusively establishes that the wounds to the victim's throat were not the last of those he received, contrary to defendant's own testimony. Having admitted cutting the victim's throat, defendant's fabrication leads to the conclusion that he did, in fact, strike the deadly blows to a living victim and then lied to conceal his acts.

There was sufficient substantial evidence to justify the jury's conclusion that defendant personally used a knife in the commission of the murder. We need not, therefore, consider the People's additional argument that the enhancement applies to use of a knife in the proximate commission of the murder, notwithstanding that the exact time of death was undetermined.

IV

PROSECUTORIAL MISCONDUCT

Defendant refers to three specific instances to justify his conclusion that the prosecutor committed prejudicial misconduct during his argument to the jury. Casting his argument in the context of an expression of personal opinion regarding the veracity of witnesses for the defense, defendant assails the prosecutor's argument calling them, "Egg-sucking, chicken-stealing gutter trash."

It has long been held that a prosecutor may properly urge his points vigorously during argument as long as he does not act unfairly, and he may use "appropriate epithets which are warranted by the evidence." (*People v. Ross* (1960) 178 Cal.App.2d 801, 808 [3 Cal.Rptr. 170], cited with approval in *People v. Fields* (1983) 35 Cal.3d 329, 362-363 [197 Cal.Rptr. 803, 673 P.2d 680].) These appropriate epithets include referring to a defendant as: "'a parasite on the community'" (*People v. Rodriguez* (1970) 10 Cal.App.3d 18, 36 [88 Cal.Rptr. 789]), "'a moral leper,'" "'a vile

ulcer,'" "'a moral cancer on the breast of humanity'" (*People* v. *Vickroy* (1919) 41 Cal.App. 275, 278 [182 P. 764]), "'animalistic tendencies'" (*People* v. *Jones* (1970) 7 Cal.App.3d 358, 362 [86 Cal.Rptr. 516]).

Nevertheless, comments such as those challenged here should be avoided. We cannot approve of extravagant and opprobrious language in arguments to juries in criminal cases. (*People* v. *Hunter* (1942) 49 Cal.App.2d 243, 250 [121 P.2d 529].) Invectives have no place in proper argument. (*People* v. *Burnette* (1940) 39 Cal.App.2d 215, 230 [102 P.2d 799].)

In the instant case, however, the trial court admonished the jury to disregard the statements to which defendant found objection: "Ladies and Gentlemen, you're to disregard the label just referred to or the comments made by [the prosecutor]." We presume that the jury heeded the admonition and any error was cured. (*People* v. *Green, supra,* 27 Cal.3d at p. 29; *People* v. *Rodriguez, supra,* 10 Cal.App.3d at p. 36.)

In response to defense counsel's argument at trial that he had called character witnesses only three times in twelve years, the prosecutor used two illustrations to argue that it is done all the time. He said: "I can tell you in the ten years I've been doing this I have not had a murder case yet where the person didn't have somebody willing to come and be a character witness for them. What does it add up to? The case that I had where the man stabbed his sister 25 times, raped her and stabbed her two children to death, he had character witnesses— . . . ." This statement by the prosecutor was apparently a reference to the death penalty prosecution in *People* v. *Haskett, supra,* 30 Cal.3d at page 848, a case which has been cited by defense counsel on appeal. Similarly, the prosecutor also mentioned that, "even Charles Manson could get character witnesses."

These references to notorious cases are not by themselves misconduct except where the prosecutor invites the jury to compare the ultimate fate of the victims. (*People* v. *Wein* (1958) 50 Cal.2d 383, 397 [326 P.2d 457], disapproved on other grounds in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1127 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]; *People* v. *Jackson* (1955) 44 Cal.2d 511, 520-521 [282 P.2d 898].) While it is error to argue facts outside the record (*People* v. *Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396]), it is not improper to argue matters of common knowledge or use illustrations from common experience, history, or literature (*People* v. *Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33], disapproved on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *People* v. *West* (1983) 139 Cal.App.3d 606, 610 [189 Cal.Rptr. 36]).

In any event, trial counsel failed to object to these references, the objection in the first instance being obviated by the trial court's swift charge to the prosecutor: "Why don't you dispense with the examples . . . ." The admonition and the absence of objections makes any possible error harmless. (See *People* v. *Green, supra,* 27 Cal.3d at pp. 27-28, 34.)

V

REJECTED INSTRUCTIONS RELATING TO MANSLAUGHTER

Defendant's final contention is that the trial court erred by refusing to instruct on the lesser included offenses of manslaughter based upon (1) an unreasonable belief of peril and (2) absence of malice due to diminished capacity.

Basing his initial assertion upon *People* v. *Flannel* (1979) 25 Cal.3d 668, 679 [160 Cal.Rptr. 84, 603 P.2d 1], defendant misconstrues the testimony in order to support his argument for an instruction that an honest but unreasonable belief of an imminent peril negates malice. By a general citation to the record, defendant erroneously concludes that "significant evidence was presented in the instant case to show that [he] acted under what he perceived to be threats and menaces by Joe Leggio which caused him to believe that his life would be in immediate danger if he did not participate in the conduct that resulted in the death of the victim."

There was considerable evidence as to defendant's intent. Defendant's testimony was actually quite clear on the issue of threats by codefendant Leggio:

"Q. [By DEFENSE COUNSEL]: Why did you hit him [the victim]?

"A. Because—I don't know why. I, uh—Joe just kept hounding me on—on—I don't know, on hittin' him and, you know, goin' along with him on this and I didn't want to.

"So just get [*sic*] him off my back I decided I would hit him and, you know, satisfy Joe so he wouldn't keep nagging me on."

On cross-examination defendant testified:

"Did he [codefendant] threaten that he would do something to you if you did not help him kill this man?

"A. No."

Defendant's testimony as to possible menaces by codefendant Leggio was initially misleading. He first testified:

"Q. What did he do in an aggressive manner that caused you to become frightened of the possibility that he would kill not only this victim but also you?

"A. The look he had on his face. I believe his fists were clenched. He was kind of tense.

"Q. It was this fierce outward appearance then that caused you to believe that you'd better go along with hitting the guy in the head or else you would also become a victim?

"A. Yes. Joe told me to knock him out.

"Q. And it was because he had this fierce look in his eye and these clenched fists that you agreed to knock him out?

"A. I agreed to just—to do whatever he told me."

In contrast, defendant shortly thereafter corrected his mistake by testifying:

"Q. Well, did he still have this evil look in his face that you described earlier or did he sort of calm down a little bit?

"A. This evil look that I saw in his face was at the point where I grabbed Joe. That's when I first noticed this wicket [sic] look in his eyes.

"Q. Now when was that?

"A. That was after, um—that was after I went down and got the stick and after Joe had started beatin' him with it.

"Q. You mean after you went down to the truck and got your stick and came back; is that right?

"A. Yes.

"Q. So you never saw this evil, fierce look in his face before you yourself struck him in the face these two times?

"A. I guess not."

Defendant's testimony is therefore quite clear that he was not subjected to threats or menaces by codefendant Leggio before he began the attack on the victim. His only defense was that he was *afraid of the codefendant* because "he was a lot bigger than me and he was really buffed and he was in [*sic*] lifting weights and he was very aggressive and very, uh—he was very aggressive." Defendant testified that he followed the codefendant's direction to run downstairs and get a stick from his truck because "I was afraid of Joe and I just wanted to do what he told me." Similarly, he later testified that he went along with the whole thing because he felt "that if Joe was to hurt one guy he would hurt me, too, if I didn't go along with him."

Defendant's only assertion of an actual threat by codefendant Leggio occurred at the end of the victim's ordeal when, after having stabbed the victim many times and returned to the truck, codefendant Leggio pointed the blade of the knife toward defendant's face and held it a few inches away, causing defendant to feel threatened. It was at this time, however, that defendant believed the victim was already dead. Defendant never testified that he believed that he was in *imminent peril* of life or great bodily injury from codefendant Leggio.

Based on this record defendant's request that the court give an instruction on unreasonable belief of peril seems absurd. Defendant requested that the court instruct in a modified version of CALJIC No. 8.41 as follows:

"Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought.

"There is no malice aforethought if the killing is in the honest but unreasonable belief in the necessity to *defend against imminent peril* of life or great bodily injury." (Italics added.)

Not only is there a total absence of any testimony that defendant personally had a belief that he was in imminent peril of life or great bodily injury, but also there is no legal theory to support an instruction that in order to *defend* against imminent peril from his *codefendant,* he would thereby have no malice aforethought in his attack on the victim, who was not connected with the codefendant. Out of an abundance of caution the trial court did

instruct as defendant requested on the issue of threats and menaces.[3] This instruction was more than sufficient to cover the defense theory of the case. There was no substantial evidence to support the requested instruction on unreasonable belief of peril, and it was properly declined. (*People* v. *Flannel, supra,* 25 Cal.3d at p. 685; *People* v. *Keating* (1981) 118 Cal.App.3d 172, 178-179 [173 Cal.Rptr. 286].)

■ Similarly, defendant's request for CALJIC No. 8.45 defining involuntary manslaughter was properly refused due to lack of sufficient evidence. Defendant's testimony that he hit the victim with the intent to knock him out rather than kill him does not establish the requisite commission of the underlying misdemeanor inherently dangerous to human life or the ordinarily lawful act involving a high degree of risk of death or great bodily harm.[4] Assault with a deadly weapon is a felony. (Pen. Code, § 245.)

■ Finally, defendant argues that the court should not have rejected his requested instruction on absence of malice due to diminished capacity resulting from intoxication and reducing the crime to voluntary manslaughter, CALJIC No. 8.41. The short answer to this contention is that the defense of diminished capacity had long been abolished by the time of defendant's crime in November of 1982.[5] Penal Code section 28, subdivision (b) states: "As a matter of public policy, there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing." Thereafter, the initiative

---

[3]The court instructed pursuant to CALJIC No. 4.40: "A person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances:

"1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and

"2. If such person then believed that his life would be so endangered.

"This rule does not apply to threats, menaces, and fear of future danger to his life."

[4]CALJIC No. 8.45 (1980 rev.) as offered by defendant:

"[Defendant is charged in [Count ____ of] the information, with the commission of the crime of involuntary manslaughter, a violation of Section 192 of the Penal Code.]

"Involuntary manslaughter is the unlawful killing of a human being without malice aforethought and without an intent to kill.

"In order to prove the commission of the crime of involuntary manslaughter, each of the following elements must be proved:

"1. That a human being was killed, and

"2. That the killing was unlawful.

"A killing is unlawful within the meaning of this instruction if it occurred:

"1. During the commission of a misdemeanor which is inherently dangerous to human life, namely, the offense[s] of _____; or

"2. In the commission of an act ordinarily lawful which involves a high degree of risk of death or great bodily harm, without due caution and circumspection."

[5]Approval of CALJIC No. 8.41 (1979 re-revision) was withdrawn by CALJIC in view of the adoption of Penal Code section 28 in 1981.

measure passed as Proposition 8 by the voters on June 8, 1982, further provided in Penal Code section 25, subdivision (a): "The defense of diminished capacity is hereby abolished. In a criminal action . . . evidence concerning an accused person's intoxication . . . shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged." The instruction was properly refused, particularly in view of the CALJIC No. 4.21 instruction given on the impact of voluntary intoxication in determining specific intent to kill.[6] (See *People v. McCoy* (1984) 150 Cal.App.3d 705, 710-711 [198 Cal.Rptr. 94].)

## VI

### Aiding and Abetting Instructions

Both CALJIC Nos. 3.00 (1981 rev.) and 3.01 (1980 rev.) instructions defining "principals" and "aiding and abetting" were given in this case in approximately the identical form subsequently ruled erroneous in failing to inform the jury that an aider and abettor must have "criminal intent." (*People v. Beeman, supra,* 35 Cal.3d at page 560; *People v. Caldwell* (1984) 36 Cal.3d 210, 223-224 [203 Cal.Rptr. 433, 681 P.2d 274].) The specific forms of the instructions given here were ruled defective on *Beeman* grounds in *People v. Tovar* (1984) 161 Cal.App.3d 137, 140-141 [207 Cal.Rptr. 255].

These errors, however, have already been found harmless by our Supreme Court where, as here, the defense was duress and the jury was properly instructed in accordance with CALJIC No. 4.40.[7] (*People v. Caldwell, supra,* 36 Cal.3d at p. 224.) The jury's rejection of the defense version that he acted only out of fear for his life means that the erroneous instructions could not have affected the jury deliberations and verdict.[8]

---

[6]CALJIC No. 4.21 (1981 rev.) provides:

"In the crime of *murder* of which the defendant is accused . . ., a necessary element is the existence in the mind of the defendant of the [specific intent to *kill*] . . . .

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such [specific intent] . . . .

"If from all the evidence you have a reasonable doubt whether defendant formed such [specific intent] . . ., you must give the defendant the benefit of that doubt and find that he did not have such [specific intent] . . . ."

[7]See footnote 3, *ante.*

[8]It therefore becomes unnecessary to consider whether the trial court's modification of CALJIC No. 8.20 to require "a clear, deliberate intent, on the part of the defendant Williamson to kill" for first degree murder had the desired effect on criminal intent for aiding and abetting.

## DISPOSITION

The judgment of conviction is affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 23, 1986.