Filed 6/30/15  P. v. Brown CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CHRISTOPHER LEE BROWN,<br><br>　　　Defendant and Appellant. | B254939<br><br>(Los Angeles County<br>Super. Ct. No. GA091665)<br><br>**ORDER MODIFYING OPINION**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:[*]

　　　It is ordered that the opinion filed herein on June 2, 2015, be modified as follows:

　　　On page 11, the first sentence of the first full paragraph, the words "Judge Dasher," are deleted so the sentence now reads:

> Thereafter, on March 3, 2014, before Judge Moses, defense counsel informed the trial court that appellant had "made some remarks that I think could be interpreted perhaps as a *Marsden*."

　　　There is no change in the judgment.

---

[*]　ASHMANN-GERST, Acting P. J.　　　CHAVEZ, J.　　　HOFFSTADT, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER LEE BROWN,<br><br>    Defendant and Appellant. | B254939<br><br>(Los Angeles County<br>Super. Ct. No. GA091665) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Jared D. Moses, Judge.  Affirmed.

Laurie Wilmore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Christopher Lee Brown of two counts of second degree commercial burglary (Pen. Code, § 459)[1] (counts 1 & 2) and one count of receiving stolen property (§ 496, subd. (a)) (count 3). In a bifurcated proceeding, the trial court found appellant had suffered two prior convictions for which he served prison sentences (§ 667.5, subd. (b)). The trial court sentenced appellant to county jail for a total term of four years eight months, determined as follows: The midterm of two years for the burglary in count 2, plus a consecutive eight months (one-third the midterm for count 1), plus two years for the prior prison enhancements.[2]

Appellant contends the trial court (1) erred by instructing the jury with CALJIC No. 2.15, (2) gave incorrect responses to two of the jury's questions, and (3) failed to properly investigate the basis of his *Marsden*[3] claim. We disagree and affirm.

**FACTS**

**The Office Campus**

Appellant was a transient who frequently trespassed on an office campus located in the City of Alhambra (the campus). The campus had numerous buildings that housed multiple companies and government agencies. Rolando Valdovinos (Valdovinos), a security guard at the campus, had contacts with appellant, had escorted appellant off the campus, and had told appellant he was not allowed on the campus and not to come back.

One of the companies located at the campus was AHMC Healthcare (AHMC), which had an office on the sixth floor of one of the buildings. AHMC provided billing and reporting services for six regional hospitals. The company maintained the personal data of approximately 700,000 patients of the hospitals. There were three main doors leading into AHMC's office, which were kept locked and could only be opened by

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    The sentence on count 3 was stayed pursuant to section 654.

[3]    *People v. Marsden* (1970) 2 Cal.3d 118.

2

swiping an electronic badge. There were four security cameras on the sixth floor that recorded movement.

AHMC's office was closed to the public, and Saturdays were not normal working days for employees. No nonemployees had permission to enter AHMC's office on October 12, 2013.

**October 12, 2013—Count 2[4]**

On Saturday, October 12, 2013, around 10:30 a.m., Saul Chihchan Hsu (Hsu), a financial analyst at AHMC, went to the office to print out some reports. He used his badge to unlock one of the doors. No one else was there at the time. The office's security cameras recorded him leaving after about 15 minutes at 10:45 a.m. When he left the office, Hsu made sure the door locked behind him. He only checked the door that he used.

Around 11:10 a.m., AHMC's security cameras recorded appellant entering the office through a different door than the one Hsu had used. Appellant was wearing a black hooded sweatshirt with a blue skull on the backside. The hood was pulled up. The security cameras recorded appellant walking around the floor, through cubicles, and trying to open locked interior office doors.[5] Appellant then walked to an area not covered by the security cameras. Hsu and Peter Zhou (Zhou), another financial analyst at AHMC, had their workspace cubicles located in this area. Appellant was later recorded carrying what appeared to be a bag out of the office.

When Zhou came to work on Monday, October 14, 2013, he discovered that his laptop computer was missing from the desk in his cubicle. A second laptop belonging to the coworker who sat next to him was also missing. A flash drive used by Zhou was also gone. He last saw the flash drive the previous Friday, October 11, 2013. The flash drive contained information pertaining to patients at the various hospitals. The flash drive had

---

[4]     The charging information did not list the burglaries in chronological order.

[5]     Portions of the security recordings were played for the jury, and still photographs were made from the recordings and used as evidence.

Excel files that had been deleted, but were recoverable. The laptops contained personal information of the approximately 700,000 patients. Zhou's computer was password protected, but it could be overridden by someone with a technological background.

When Hsu arrived at work on Monday morning, he noticed that his desk drawer was slightly open and a flash drive was missing from the drawer. Hsu last saw the flash drive on the previous Friday. He used the drive to transfer data from his laptop to a desktop computer. The drive contained some of his personal information and data files pertaining to AHMC. A camera was also missing. The police were contacted.

It was discovered that someone had shoved tissue paper into one of the locks of an entry door, which kept the door from automatically locking. This was the same door used by appellant to enter the office.

As a result of the security breach, AHMC mailed letters to all of the approximately 700,000 patients impacted by the breach. For a number of the patients, the company had to provide identity theft monitoring services.

**October 23, 2013—Count 3**

Alhambra Police Department Detective Katie Ng was assigned to investigate the thefts at AHMC. The crime raised considerable concern because it involved the personal information of approximately 700,000 patients. Appellant was identified as a suspect from the security recordings.

On October 23, 2013, Alhambra Police Corporal Timothy Diller responded to a location in Los Angeles that was frequented by appellant and where other officers were already looking for appellant. Appellant came out from behind a building and told the officers his name. He was wearing the same hooded sweatshirt he was seen wearing on the security cameras at AHMC. Appellant was arrested and taken into custody. The flash drive belonging to Hsu was found in the right front pocket of appellant's pants. Appellant was also carrying a black duffle bag. Inside the bag, Corporal Diller found the flash drive taken from Zhou's desk. Another flash drive not related to AHMC was also inside the bag.

4

After appellant was arrested, Detective Ng spoke with him. Appellant waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Appellant stated that he often went to the campus to look for cigarettes or to take a shower.[6] He said that the doors to the facility were often left unlocked. Appellant admitted being at the location on October 12, 2013, but he denied taking any laptops, and said he found the flash drives on the ground. The detective showed appellant a still frame from the security recording. Appellant admitted that it was a picture of him. Appellant said he was carrying a bag of groceries and a shirt.

Alhambra Police Department Detective Minh Lee, assigned to the High-Tech Crimes Unit, examined the contents of the flash drives. Officer Lee estimated there were thousands of files relating to personal identifying information on the drives. He explained that the information could be accessed even if password protected, which was not the case here. He also testified that individual profiles relating to stolen personal identification information sell on the black market for between $20 and $40 each.

**December 3, 2013—Count 1**

On December 3, 2013, around 11:30 a.m., security officer Valdovinos received a call that a suspicious person was on AHMC's floor. Valdovinos went to the building and walked through all of the floors. He eventually saw appellant on the ground floor pushing a wheeled office desk chair out of the building. The chair held a light fixture and books. The chair was taken from an area on the first floor where salvaged equipment was stored. The chair was the property of the County of Los Angeles, which had offices in the building. Valdovinos asked appellant what he was doing with the items. Appellant stated he was taking items that were given to him. Valdovinos confirmed with the facilities manager for the Los Angeles County Public Health Substance Abuse Program, located in the building, that appellant did not have permission to take the property.

---

[6]     AHMC's office did not have a shower.

Valdovinos called the police. He then followed appellant and watched him push the chair off the campus and down the street. Valdovinos also took several photographs with his cell phone of appellant moving the property. Appellant was arrested.

## DISCUSSION

### I. CALJIC No. 2.15

Appellant contends the trial court erred by instructing the jury with CALJIC No. 2.15,[7] because the instruction allowed the jury to presume appellant's guilt of burglary based on slight corroborating evidence rather than forcing the prosecutor to prove beyond a reasonable doubt that appellant had the intent to steal at the times he entered the building.

Our Supreme Court has rejected this argument. In *People v. Johnson* (1993) 6 Cal.4th 1, 37 the court stated: "Defendant asserts that CALJIC No. 2.15 created an improper *presumption* of burglary arising from the mere fact of possession of stolen property. But the instruction does not so state. Indeed, it relates a contrary proposition: a burglary may not be presumed from mere possession unless the commission of the offense is corroborated. . . . Thus, contrary to defendant's assumption, CALJIC No. 2.15 did not remove the issue of intent from the jury's consideration." (See also *People v. McFarland* (1962) 58 Cal.2d 748, 754 ["Possession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt"].)

---

**7**      The jury was instructed with CALJIC No. 2.15 as follows: "If you find that a defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of burglary. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt.

"As corroboration, you may consider the attributes of possession—time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, his false or contradictory statements, if any, and any other evidence which tends to connect the defendant with the crime charged."

6

Moreover, the trial court also instructed the jury to "[c]onsider the instructions as a whole and each in light of all the others." The jury was instructed on the requirement that the People must prove appellant guilty beyond a reasonable doubt. The court further instructed the jury on the elements of burglary including that "[a]t the time of the entry, that person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of that property." Instructions are not considered in isolation. The ultimate question whether appellant possessed the requisite preexisting intent to steal was "left to the jury through the usual instructions regarding the elements of that offense." (*People v. Johnson, supra*, 6 Cal.4th at p. 37.)

Finally, contrary to appellant's argument, corroborating evidence of intent to steal existed on both occasions. Appellant regularly frequented the building and had been told not to return. The jury could reasonably infer that appellant knew AHMC's office was vacant on the weekends and that he could enter the premises alone. AHMC's office was on the sixth floor of the building and had doors that locked automatically. The jury could also reasonably infer that appellant's frequent trespassing gave him the opportunity to block the door from locking so that he could return later when the office was empty. It defies logic and common sense to assume that appellant just happened upon a door on the sixth floor that had its locking mechanism blocked by a wadded tissue.

After the AHMC thefts, appellant was arrested and interviewed by the police. As the People note, this would have made it unmistakably clear that appellant was not to return to the campus. Nevertheless, on December 3, 2013, he returned, entered the same building, and took an office desk chair and other items from a more readily accessible area. The jury could reasonably infer that appellant trespassed through familiar territory with the intent to enter the building for the purpose of stealing property. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 131 [permissive inference violates due process only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury].)

## II. Reponses to Jury's Questions

During deliberations, the jury submitted several questions to the trial court. Appellant contends that the court committed error in response to two questions pertaining to CALJIC No. 2.15.

The jury asked the following questions:

"1) We need clarification on the language in [CALJIC No.] 2.15. What does 'However, this corroborating evidence need only be <u>slight</u>' refer to?

"2) Can we take into consideration the defendant's mental state or condition?" (Underlining in original.)

After consultation with the attorneys,[8] the trial court responded as follows: "1. The language in Jury Instruction 2.15 speaks for itself. 2. You can consider any evidence that was presented at trial. Do not speculate about things outside the evidence."

As our Supreme Court explained in *People v. Beardslee* (1991) 53 Cal.3d 68, 97: "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" An appellate court reviews "'for an abuse of discretion any error under section 1138. [Citation.]'"[9] (*People v. Hodges* (2013) 213 Cal.App.4th 531, 539.)

---

**8**      The court's minute order indicates that it consulted with the attorneys before responding, but there is no reporter's transcript of the discussion.

**9**      Section 1138 states: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

As to the first question, appellant argues that by referring the jury back to the language of CALJIC No. 2.15, the trial court failed to fulfill its duty to assist the jury. Specifically, appellant argues "the trial court's answer to the jury's question should have clarified it could not use 'slight' evidence to decide the critical issue of *when* Mr. Brown formed any possible intent to steal. The trial court should have clarified that . . . the only fact the jury could infer from finding conscious possession of stolen property was Mr. Brown's identity and whether he had the intent to steal, not the timing of any formation of the intent to steal."

But the jury's question does not indicate that it was struggling with the issue of when appellant formed the intent to steal. The question makes no mention of this issue. Thus, appellant's argument is misplaced. The jury merely asked what "slight" corroboration referred to. As the People note, the subject of the jury's inquiry did not have a special legal meaning that differed from its common meaning. Moreover, the instruction itself gave examples of what the jury could consider as corroboration. For the trial court to give more examples would have been improper. We find no error in the trial court's response.

As to the second question, appellant argues the trial court erred by not instructing the jury that it was obliged "to consider his mental state to determine whether he had the intent to steal at the time of entry for counts 1 and 2. Telling the jury it could only consider the evidence at trial, failed to answer its specific question about whether it could consider the defendant's mental state." But the jury was specifically instructed with CALJIC No. 14.50 that in order to find appellant guilty of burglary, the jury had to find that "[a]t the time of the entry, [appellant] had the specific intent to steal . . . ." Indeed, whether appellant harbored the requisite specific intent was the focus of the defense counsel's argument and the prosecutor's rebuttal argument to the jury. Thus, there was no need for the trial court to further explain to the jury that it had to find the element of intent to steal.

We agree with the People that the jury's question more likely referred to any perceived mental or psychological condition affecting appellant. The jury heard

testimony from security guard Valdovinos that he once was asked to escort appellant off the campus because appellant was "acting irrational." The People also point out that just prior to the jury's verdicts being announced, the trial court admonished appellant not to display emotional outbursts. While the court made the admonishment outside the jury's presence, the court did say that it had seen appellant "get emotional sometimes."

In any event, we find no error in the trial court's response.

## III. *Marsden* **Claim**

Appellant contends the trial court inadequately inquired as to the basis of his request for a new attorney; therefore the matter should be remanded for a new hearing.

### A. *Background*

On February 20, 2014, before Judge Beason, appellant complained that his appointed attorney would not provide him copies of the discovery and a transcript of the preliminary hearing. Defense counsel explained that budgetary restrictions did not allow him to make such copies. As an alternative, defense counsel suggested that appellant review the discovery during jury voir dire and take notes. Appellant found this solution unacceptable because he had "A.D.D." and it would take him a while to read the material. The court noted that defendants were not provided transcripts as a matter of course unless they paid for the court reporter to prepare a new copy. Appellant stated that he needed to read the various reports to ensure that he was "being represented fairly." He also stated: "I had the A.C.L.U. involved with my case before and the F.B.I. I know I'm bringing outside issues, but these are things that I need to make sure that I'm stating for myself to feel like I'm protected because I don't always feel protected."

Defense counsel then stated: "As I've explained to Mr. Brown, I'm his attorney. I'm well-versed in every single aspect of the case. I have read the reports. When I announce ready for trial, I will be fully prepared. I'm his mouthpiece. I'm his brain. In other words, when we're in court, he has to sit down. If he wishes to testify, that will be his right. But other than that, I'm the one who does all the work. He basically just sits back and makes sure that he stays awake."

10

Thereafter, on March 3, 2014, before Judge Dasher, defense counsel informed the trial court that appellant had "made some remarks that I think could be interpreted perhaps as a *Marsden*." When asked if he was requesting a new attorney, appellant replied, "I'm not sure." Out of an abundance of caution, the court then conducted a closed *Marsden* hearing.

At the hearing, appellant complained that he had not been able to read the discovery reports. He also complained that his attorney was "kind of stand-offish," and appellant wanted "like a little bit of a doctor's manner" from his attorney. He stated that his attorney was a "nice man" and that he was "not talking against him or trying to offend him in any way," just that he wanted "to be assured" that he had an attorney who was able to represent him. Appellant worried that a "state appointed public defender . . . may possibly be, you know, not having my best interest at heart." Appellant stated there were "outside issues" that he "never really [got] to discuss openly" with his attorney, and that he kept getting put into "suppressive" living situations where his rights to free speech and free press were impeded. Appellant discussed being twice attacked by deputies in the jail and interviewed by the F.B.I. and A.C.L.U. Appellant alluded to problems in the sheriff's department and stated that he had been "harassed" and "didn't want to testify for the FBI." He complained that "they keep putting me on mental health floors and imputing [*sic*] my integrity on the certain issues that are happening." Appellant further stated: "I am a prominent actor and musician. And I wouldn't say prominent, like, you know, famous. But I have a film degree from San Diego State—or Cal State Los Angeles. I went to San Diego State University, played foo[t]ball there, [and] was in ROTC. [¶] And a lot of things have happened between the DEA and the FBI and the Sheriff[']s Department. [¶] . . . [¶] And so the collection of all these things, documented cases, you know, like, in the newspaper and at the county jail, these things, I just am really uncomfortable using a state-appointed attorney, whereas I still can't afford my own attorney." Appellant wanted "a conflict of interest attorney" or "possibly a private attorney." Appellant then stated that he had been a witness to some "pretty violent" incidents at the jail.

11

At that point, the trial court stopped appellant and after making certain his attorney was not declaring a conflict, reassured appellant that his appointed attorney was experienced, had been a lawyer for more than 30 years, and had tried hundreds of serious felony cases. The court explained, "I can say [defense counsel] has been in my courtroom many times and he is constantly a professional, he is a gentleman, and he fights very hard for his clients." Noting that appellant's request was made on the last day for trial to begin and a jury had been ordered, the court denied the motion as untimely. The court stated that even if it were timely, he would deny it because none of appellant's stated reasons for wanting a new attorney justified relieving his defense counsel.

### B. Applicable Law

Our Supreme Court has explained: "'""""When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'" [Citation.] The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would 'substantially impair' the defendant's right to effective assistance of counsel."'" (*People v. Vines* (2011) 51 Cal.4th 830, 878.)

A *Marsden* hearing is an informal proceeding "in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 803.) A trial court fulfills its inquiry obligation if it gives the defendant an opportunity to state all of his or her complaints and listens to the complaints. (*People v. Vera* (2004) 122 Cal.App.4th 970,

12

979; *People v. Williamson* (1985) 172 Cal.App.3d 737, 745; *People v. Penrod* (1980) 112 Cal.App.3d 738, 745.)

### C. Analysis

Appellant contends the trial court conducted an inadequate inquiry at the *Marsden* hearing. He complains that the court did not inquire of his attorney whether he had received copies of the discovery. But appellant had already stated that he had not, and the issue had been addressed before another judge. Appellant also complains that the court did not follow up on what "outside issues" he wanted to discuss with his attorney. But appellant identified these issues at the hearing. Finally, appellant complains that because the trial court interrupted him when he was stating he had witnessed some violent incidents at the county jail, it is "impossible" to know whether he had catalogued all his complaints. But at this point, appellant was not speaking directly about his attorney; he was discussing issues at the jail.

Contrary to appellant's claim, we find the trial court fulfilled its inquiry obligation in this case. The trial court conducted the closed hearing even though appellant initially stated that he was not certain he wanted a new attorney. The court then allowed appellant to speak for a considerable amount of time (taking up four pages of the reporter's transcript) to convey his concerns to the court. Essentially, appellant indicated he was aware of, and possibly involved with, the well-publicized reports of deputy misconduct at the Los Angeles County jail that had been the focus of a F.B.I. investigation, and that he believed a "state appointed public defender" would have a conflict of interest. Aside from complaining that his appointed attorney was "stand-offish," appellant did not have specific complaints about his attorney, "a nice man." Appellant wanted assurances that his attorney could represent his interests without a conflict of interest, and the trial court gave him those assurances. We agree with the People that taking appellant's concerns to their logical conclusion would mean recusing the entire Los Angeles County Public Defender's Office.

None of appellant's stated concerns showed that his appointed attorney was not providing adequate representation or that he and his attorney had become embroiled in an

13

irreconcilable conflict.  (*People v. Vines, supra*, 51 Cal.4th. at p. 878.)  Appellant's subjective lack of confidence in his attorney was insufficient to require substitute counsel.  "'"[I]f a defendant's claimed lack of trust in . . . an appointed attorney were sufficient to compel appointment [or] substitut[ion of] counsel, defendants effectively would have a veto power over any appointment and by process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law."'" (*People v. Memro* (1995) 11 Cal.4th 786, 857.)

The trial court adequately conducted the *Marsden* hearing.  Accordingly, the court did not abuse its discretion in denying the motion.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
                    ASHMANN-GERST


We concur:


_____, J.
          CHAVEZ


_____, J.
          HOFFSTADT

14